Harry WALSWEER, Appellant,

v.

HARRIS COUNTY, Appellee.

Edmond S. "Tracy" MAXON, III, Tim Martin, Brian Black, Corey Dwayne Burkhalter, and John Schlein, Appellants,

v.

Harry WALSWEER, Appellee.

No. 11–89–182–CV.

Court of Appeals of Texas, Eastland.

Aug. 23, 1990.

Rehearing Overruled Oct. 25, 1990.

Mike Driscoll, Ann Hardy, David H. Miller, Barbara Toby Baruch, Anthony F. Loria, Renuka Jain, Harris County Attorney's Office, Houston, for Harris County, Edmond S. "Tracy" Maxon, III, Tim Martin, Brian Black, Corey Dwayne Burkhalter and John Schlein.

David W. Holman, Larry P. Boyd, Richard P. Hogan, Jr., Fisher, Gallagher, Perrin & Lewis, Houston, for Harry Walsweer.

DICKENSON, Justice.

After calling for police assistance, Harry Walsweer was shot in the back five times by four Harris County deputy constables on September 14, 1984. Walsweer was in his own home at the time of the shooting, and he is now a paraplegic as a result of his gunshot wounds.

Walsweer filed suit under 42 U.S.C.A. § 1983 (West 1981), alleging that he had been deprived of his constitutional rights under the Constitution of the United States. The defendants are Harris County,[1] one of its constables,[2] and four of the constable's deputies.[3] At the close of all the evidence,[4] the trial court granted Harris County's motion for instructed verdict and then submitted the factual disputes as to the other defendants to a jury which answered all questions in Walsweer's favor. Judgment was then rendered that Walsweer take nothing as to Harris County and that he recover $5,799,101.00 plus prejudgment interest of $478,103.20 from all of the other defendants "in their official capacities."[5] Walsweer appeals the instructed verdict, arguing that he is entitled to judgment against Harris County. The constable and all four deputies appeal the judgment rendered against them. We reverse and remand as to the instructed verdict, and we affirm as to the judgment against the constable and his deputies.[6]

1. Harris County was represented at trial and on appeal by Assistant County Attorney Anthony F. Loria.

2. Edmond S. "Tracy" Maxon, III, is one of the eight constables who had been elected by the voters of Harris County as of the date of the shooting, and he is the constable who hired the four deputies who were involved in the shooting. Maxon was represented at trial and on appeal by Assistant County Attorney James C. Faulkner.

3. Two of the deputies, Tim Martin and Brian Black, were fully certified by the State agency which oversees the training of law enforcement officers and have joined in one appellants' brief; they were represented at trial by Assistant County Attorney Lupe Salinas and on appeal by Assistant County Attorney David H. Miller. The other two deputies, Corey Dwayne Burkhalter and John Schlein, were not certified and have joined in a separate appellants' brief; they were

represented at trial by Assistant County Attorney Ann Hardy and also by Assistant County Attorney David H. Miller (who represents Martin and Black on appeal); and they are represented on appeal by Assistant County Attorney Ann Hardy.

4. The trial began on February 16, 1988, and the evidence was closed on March 1, 1988.

5. For an explanation of why Walsweer sought judgment against the Constable and his deputies "in their official capacities," see *Brandon v. Holt*, 469 U.S. 464, 471, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985).

6. This appeal was transferred from the 1st Houston Court of Appeals to this Court pursuant to TEX.GOV'T CODE ANN. sec. 73.001 (Vernon 1988).

## Factual Background

On the night of September 14, 1984, Walsweer's daughter, Sharri, got into a heated argument with her husband, Mike Sherer. They were separated, and she had filed for divorce. Mike was mad because she had brought a man, Terry Lee Mann (whom she later married), to her parents' home where she was staying with their small child. Walsweer and his wife, Sherron, asked Mike to leave. Sherron came back into the house and asked Sharri to call the police. Sharri called the City of Houston Police Department, and Terry called the Harris County Constable's Office. Walsweer came back into the house and reported that Mike had left.

Shortly thereafter, while Sharri was preparing a bottle for her baby, she saw someone with a gun at the kitchen window. She thought it was Mike, and she dropped to her knees. She called out, "Mike's back. He's got a gun." Sherron picked up a .22 caliber pistol and went to the front door. When she opened the door to see if Mike was out there, she saw a red streak come out from underneath a bush. She dove to the floor.[7] Harry Walsweer was standing behind her, about nine feet from the entryway, when he was hit by a hail of bullets. The four deputy constables had all fired at the same time. At least 15 shots were fired, and Walsweer was hit five times. One bullet entered the back of his right shoulder; one entered his right buttocks; one entered his left buttocks; one entered the bend in the back of his right leg; and one entered the bottom of his right foot.

Walsweer was hospitalized for over eight months, and he is now confined to a wheelchair. He has no bowel or bladder control, and he is in constant pain and requires constant care. The stipulated past medical expenses total $731,763.87.

The four deputy constables violated police procedures. Two expert witnesses were of the opinion that the deputy constables' actions were grossly negligent.

There was evidence that Constable Edmond S. "Tracy" Maxon, III, had a policy of putting deputy constables on the street with badges and guns before they had been trained and certified. There was also evidence that the Commissioners Court was aware of this policy and that they had budgetary control over the funding of each constable's office. After this incident the Commissioners Court exercised more authority over the staffing of the constables' offices.

## The Jury's Verdict

1. Do you find that Precinct 5 Deputy Constables, at the time of the occurrence in question, deprived Plaintiff, Harry Walsweer, of his constitutional rights by shooting at him recklessly and with conscious disregard of a substantial and unjustifiable risk of injury or death?

Answer: Yes.

2. Do you find that such action was a proximate cause of the occurrence in question?

Answer: Yes.

3. Do you find that the Precinct 5 Deputy Constables were grossly negligent on the occasion in question in any one or more of the following particulars: (1) in rushing their approach to the Walsweer residence once they arrived and observed no man in the front yard with a gun; (2) in failing to utilize their radio to radio the dispatcher and request that the dispatcher phone the Walsweer residence and inform the residents that the officers had arrived at the Walsweer residence; (3) in failing to utilize their public address system to inform the residents of the Walsweer home that the officers had arrived at the Walsweer residence; (4) in failing to adequately make their arrival and presence known to the residents of the Walsweer home; (5) in approaching the Walsweer home from the side of the house so as to alarm the residents; (6) in

---

7. The jury rejected the deputies' testimony as to what happened that night. The deputies testified that Mrs. Walsweer came to the door with a gun in her hand and went back inside after they identified themselves as "cops." The deputies also testified that Mr. Walsweer came out after his wife went inside, that he had a gun in his hand which he pointed at two of the deputies before firing at one of them, and that they returned his fire.

concealing themselves in the trees and bushes in front of the Walsweer home; and (7) in discharging their weapons without adequately advising the residents of Walsweer home of their presence?

Answer: Yes.

4. Do you find that such gross negligence was a proximate cause of the occurrence in question?

Answer: Yes.

5. Do you find that serious incompetence or misbehavior was general or wide spread throughout Precinct 5?

Answer: Yes.

6. Do you find that such incompetence or misbehavior was known by Harris County?

Answer: Yes.

7. Did Tracy Maxon have an official policy or custom of providing inadequate training to Deputy Constables in Precinct 5?

Answer: Yes.

8. Did that official policy or custom constitute "gross negligence"?

Answer: Yes.

9. Was that gross negligence a proximate cause of the occurrence in question?

Answer: Yes.

9A. Was such action or gross negligence attributable to the policy or custom found by you in Answer to question No. 9 to be a proximate cause of the occurrence in question?

Answer: Yes.

The stipulated past medical expenses and the jury's findings on the other elements of damages come to a total of $5,799,101.87. None of the appellants have challenged any of the damage findings.

### Walsweer's Appeal

Walsweer argues that the trial court erred in granting an instructed verdict that

he take nothing on his claim against Harris County. We agree.

Section 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof *to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured* in an action at law, suit in equity, or other proper proceeding for redress. (Emphasis added)

This statute was enacted in 1871, but it was not applied to governmental units until 1978 when the United States Supreme Court reexamined the legislative history and concluded that "municipalities and other local governmental units" are "persons" within the meaning of Section 1983. See *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Monell* requires a plaintiff to show that his or her injuries resulted from a governmental "policy or custom." 436 U.S. at 694, 98 S.Ct. at 2037. *Monell* defines "policy" as "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690, 98 S.Ct. at 2036. *Monell* defines "custom" as a "persistent and widespread" practice even though it has not been officially adopted. 436 U.S. at 691, 98 S.Ct. at 2036.

The United States Supreme Court has also made it clear that: "good faith" is not a defense to claims under Section 1983;[8] the states' sovereign immunity is not a defense;[9] and the governmental-proprietary distinctions are of no consequence.[10]

■ It is also clear that a county is liable under Section 1983 for civil rights violations resulting from the actions of a county official who had "final policymaking au-

---

8. See *Owen v. City of Independence, Missouri,* 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673, *rehearing denied,* 446 U.S. 993, 100 S.Ct. 2979, 64 L.Ed.2d 850 (1980).

9. See *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

10. See *Owen v. City of Independence, Missouri,* 445 U.S. at 644, 100 S.Ct. at 1412.

thority." See *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Six of the justices agreed that Hamilton County could be liable for the actions of deputy sheriffs who followed instructions which they received from the county prosecutor. The Court held that the county prosecutor was an official with authority to make policy respecting law enforcement practices. (Brennan, J., joined by Marshall and Blackmun, JJ.; White, J., concurring; Stevens, J., concurring; and O'Connor, J., concurring). The plurality opinion noted:

> The Deputy Sheriffs ... sought instructions from their supervisors. The instructions they received were to follow the orders of the County Prosecutor. The Prosecutor made a considered decision based on his understanding of the law and commanded the officers forcibly to enter petitioner's clinic. That decision directly caused the violation of petitioner's Fourth Amendment rights.
>
> Respondent [Hamilton County] argues that the County Prosecutor *lacked authority to establish municipal [county] policy respecting law enforcement practices because only the County Sheriff may establish policy respecting such practices....* We decline to accept respondent's invitation to overlook this delegation of authority. (Emphasis added)

■ As in *Pembaur*, the record is clear that Constable Maxon had authority to establish county policy as to the training and qualification of the deputies in his precinct. The Commissioners Court had delegated that authority to the constables by acquiescing in each constable's hiring and training policies. The Commissioners Court had budgetary control over each constable. Indeed, after the regrettable incident which led to Walsweer's injuries, the Commissioners Court exercised additional control over the hiring and training policies of the constables. See and compare *City of Canton, Ohio v. Harris*, 489 U.S. 378, ——, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412, 427 (1989), where the Supreme Court held that a municipality could be liable under Section 1983 for constitutional violations resulting from its failure to properly train police officers if:

> [T]he need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

In granting Harris County's motion for instructed verdict, the trial court understandably relied on *Rhode v. Denson*, 776 F.2d 107 (5th Cir.1985), *rehearing en banc den'd*, 778 F.2d 790, *cert. den'd*, 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986), where the Fifth Circuit held that a constable "lacked the power to make county policy." *Rhode* is factually distinguishable because Harris County argued in this case that Constable Maxon was the final authority in his precinct on the selection, training, and activities of his deputies. The county cannot escape liability by now arguing that the constable did not have policy-making powers in his portion of the county. The Supreme Court held that a county could be held liable for the policies established by the county prosecutor in *Pembaur*. Moreover, the Court in *Rhode* was facing an isolated incident while the evidence before us shows that Constable Maxon's policies were of long standing duration and were well known to the Commissioners Court which continued to pay several hundred deputies who had been employed by him.

The jury in this case specifically found that the "serious incompetence or misbehavior" in Constable Maxon's precinct "was known by Harris County." The jury also found that Constable Maxon had "an official policy or custom of providing inadequate training" to his deputies. The trial court rendered judgment against Constable Maxon and the four deputies "in their official capacities."

Walsweer has briefed three points of error. He argues that the district court erred: (1) in granting an instructed verdict to Harris County because there was ample evidence that Constable Maxon was the county's policymaker (as to the hiring and training of deputies in his precinct); (2) in

granting an instructed verdict to Harris County because there was some evidence that its Commissioners Court was the county's policymaker (as to the hiring and training of deputy constables); and (3) in excluding evidence relevant to the policy or custom of Harris County (in hiring and training deputy constables). We sustain all three points of error.

There was evidence that Constable Maxon was the final policymaking authority in the training of deputy constables in his precinct, and the jury found him liable in "his official capacity." There was also evidence the Commissioners Court of Harris County had control over the hiring and training of deputy constables through its power to refuse to pay the deputy constables unless they were properly hired and trained. In reviewing an instructed verdict, an appellate court is required to view the evidence in the light most favorable to the non-movant, disregarding all evidence and inferences which are contrary to the non-movant's position. See, e.g., *Henderson v. Travelers Insurance Company*, 544 S.W.2d 649, 650 (Tex.1976).

### The Other Appeal

Three separate appellants' briefs were filed by three different assistant county attorneys: one for the elected Constable, Edmond S. "Tracy" Maxon, III; one for the two certified deputy constables, Tim Martin and Brian Black; and one for the uncertified deputies, Corey Dwayne Burkhalter and John Schlein.

Constable Maxon presents three points of error, all of which are directed at Questions 9 and 9A. He argues that the trial court erred in overruling his objections to these questions and his motion for new trial because the questions asked if his "official policy of inadequate training" was *a proximate cause of the occurrence*, arguing that the controlling law requires them to be submitted as to whether the policy was *a moving force* rather than a proximate cause.

Martin and Black present four points of error. They argue that the trial court erred: (1) in overruling their motion for mistrial because the prejudicial effect of the testimony of Katherine Newman (about the service of citation on Constable Maxon) far outweighed its probative value; (2) in overruling their motion for instructed verdict because "there was no evidence to submit to the jury Questions Nos. 1 through 4"; (3) in overruling their motion for judgment non obstante veredicto because "there was no evidence to support the jury's answers to Questions Nos. 1 through 4"; and (4) in overruling their objections to the submission of Questions 2 and 4 in terms of "proximate cause" rather than "moving force."

Burkhalter and Schlein present ten points of error. The first four points relate to the motion for mistrial, and they overlap with Martin and Black's first point of error. In Points 5 and 6, they argue that the trial court erred in overruling their objections to the charge because "the instructions were an incorrect statement of the law" and probably caused an improper verdict. In Points 7 and 9, they argue that "there was no evidence to support the jury's answer" to Questions 1 and 3, and, in Points 8 and 10, they argue that the trial court erred in overruling their "objections to the form of answer" to Questions 1 and 3. Points 7 and 9 overlap with Martin and Black's Points 2 and 3.

All of the points of error filed by the constable and his deputies have been considered, and each is overruled.

The court's submission of these questions to the jury is correct. "Proximate cause" (not "moving force") is the correct legal standard of causation for recovery under Section 1983 actions. See *Grandstaff v. City of Borger, Texas,* 767 F.2d 161, 168 (5th Cir.1985), *cert. denied,* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987). See also Kritchevsky, *"Or Causes To Be Subjected": The Role of Causation in Section 1983 Municipal Liability Analysis,* 35 U.C.L.A. L.REV. 1187 at 1193 (1988).

There is evidence to support the jury's answers to each of the challenged questions. These contentions have been re-

viewed in compliance with *Martinez v. Delta Brands, Inc.*, 515 S.W.2d 263, 265 (Tex. 1974):

When a party asserts that there is no evidence to support jury findings, *we must review the evidence in its most favorable light, considering only the evidence and inferences which support the findings, and rejecting the evidence and inferences contrary to the findings.* (Emphasis added)

■ The trial court did not err in permitting evidence as to the service of citation on Constable Maxon to impeach his credibility. During his direct examination as an adverse witness, Constable Maxon testified:

Q: Are you here voluntarily or by subpoena, Mr. Maxon?

A: Voluntarily.

Q: Were you not, in fact, subpoenaed day before yesterday to appear and testify in this case?

A: No. I found the subpoena one morning in my driveway.

\* \* \* \* \* \*

Q: Let me show you what's been marked as Plaintiff's Exhibit 28, and ask you based upon your background what that is?

A: Looks like a subpoena from a private process server where they say they served me on the night of my anniversary.

Q: What night was that?

A: The 22nd [of February 1988].

Q: You don't recall receiving that subpoena personally?

A: Sir, I did not receive that subpoena personally.

Q: Did you get involved in an altercation with the person serving—

A: I never met anybody trying to serve that subpoena on me. [He also testified that there was no dollar attached to the subpoena.]

Katherine Newman testified as an impeachment witness, contradicting Maxon's testimony, by giving the following testimony:

Q: Let me show you what's been marked as Plaintiff's Exhibit No. 28 in this case and ask you if you've ever seen that or recognize that?

A: Yes, sir. I do.

Q: How is it that you know something about Plaintiff's Exhibit 28?

A: Because I served the subpoena on Mr. Maxon.

\* \* \* \* \* \*

Q: Tell the members of the jury, Ms. Newman, how it is that you're sure that's the man you served that subpoena on?

A: Mr. Maxon pulled a .357 on me and shoved me in the corner of his porch.

\* \* \* \* \* \*

Q: Was there a dollar attached to it when you subpoenaed Mr. Maxon?

A: Yes, sir. It was attached to the piece of paper.

Q: Okay.

A: At the top.

Q: I assume the reason there is no signature down here—did Mr. Maxon after pulling the pistol refuse to sign it?

A: Yes, sir.

Q: I assume that you left rather quickly at that stage?

A: Yes, sir. When he was through with me.

■ After lengthy discussions outside the presence of the jury, the trial court overruled the motion for mistrial which was urged by all of the appellees. The trial court then instructed the jury as follows:

I apologize to you, ladies and gentlemen, but the case has developed several difficult legal problems which counsel and the Court needed to solve. Now, I'm going to read it to you, an instruction on behalf of the defendants in this case arising out of the testimony that you heard yesterday evening. And here is the instruction to the jury. There was evidence presented before this jury that he had, Tracy Maxon, allegedly pointed a handgun at an individual who was attempting to serve a subpoena on him on February 22, 1988. Such evidence, if

true, would possibly constitute a criminal offense committed by Ed Tracy Maxon.

To the extent that such testimony is found credible by you, then you should not and are not to consider in any way evidence of this extraneous or unrelated matter against any of the four deputy constables, namely: Tim Martin, Brian Black, Corey Burkhalter, and John Schlein, and Harris County, who are named as Defendants in this case.

Maxon's brief does not attack the admissibility of this impeachment testimony, and we hold that the limiting instruction was sufficient to cure any complaint urged by the other appellants. They have not shown reversible error under TEX.R.APP.P 81(b)(1).

### This Court's Ruling

The judgment of the trial court is reversed insofar as it ordered that Harry Walsweer take nothing from Harris County, and that cause is remanded to the trial court. The judgment of the trial court is affirmed insofar as it ordered that Harry Walsweer recover his damages from Edmond S. "Tracy" Maxon, III, Tim Martin, Brian Black, Corey Dwayne Burkhalter, and John Schlein "in their official capacities."

Reversed and remanded in part; affirmed in part.