**United States Court of Appeals**
**Fifth Circuit**
**F I L E D**
**August 31, 2006**
Charles R. Fulbruge III
Clerk

REVISED SEPTEMBER 20, 2006

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 05-30857

_____

FORDOCHE INC., ET AL,

Plaintiffs-Appellants

versus

TEXACO INC; ET AL,

Defendants

TEXACO EXPLORATION AND PRODUCTION, INC.

Defendant-Appellee

_____

Appeal from the United States District Court for
the Middle District of Louisiana

_____

Before KING, BARKSDALE, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

1

This case deals with the performance of obligations under right of first refusal (ROFR) clauses, also termed "preferential rights" clauses, in four joint operating agreements (JOAs) to which defendant-appellee Texaco Exploration and Production, Inc. ("TEPI") and plaintiffs-appellants, Fordoche, Inc. and Ronnie and Rebecca Theriot ("Fordoche group") were parties. Each of the ROFR clauses required that any party to the JOA, before selling any of its mineral interest described in the JOA to a third party, must first offer the same interest to the other parties to the JOA on the same terms as that of the contemplated sale to the third party. TEPI planned to sell its mineral leases affected by the four JOAs to a third-party, EnerVest Energy, L.P., as part of a $78+ million package sale including additional mineral leases in several areas of the state. Before doing so, TEPI sent the Fordoche group letters notifying them of its planned

package sale and calling on them to exercise their preferential rights for a price of $2+ million within 30 days. The Fordoche group expressed interest but questioned whether TEPI's letters amounted to a good faith offer to sell them, for a fairly allocated amount, the identical type and quantity of property rights that TEPI planned to sell to EnerVest. The Fordoche group contends that despite its requests for information, it never received satisfactory answers to its questions. TEPI, on the other hand, takes the position that the letters it sent the Fordoche group fulfilled its obligations to the Fordoche group and that the group did not request additional data or explanation. It is undisputed that the Fordoche group did not exercise or waive its preferential rights as TEPI demanded in its letters, or in any other way; and that some seven months after the Fordoche group received the letters TEPI sold all of its interests affected by the four JOAs to EnerVest in the package

3

sale as planned. The Fordoche group brought this suit, claiming that they had been damaged by TEPI's failure to comply in good faith with the ROFR clauses.

The ultimate question in this appeal is whether, based on the record before us, TEPI performed its obligations in good faith as required by the ROFR clauses and, therefore, is entitled to summary judgment dismissing the Fordoche group's claims. We conclude that TEPI has failed to carry its burden of showing that there is no genuine issue as to any material fact or that it is entitled to a judgment as a matter of law.

Favoring the non-moving parties in the resolution of genuine issues as to material facts and in drawing reasonable inferences, the evidence presented for and against summary judgment is reasonably susceptible to the following interpretation:

(1) TEPI breached its obligations under the ROFR

clauses found within the JOAs because:

(a) Under the August 29, 1962 JOA, the Fordoche group had a preferential right to purchase from TEPI, "its interest, in whole or in part, in the properties affected by this agreement" that TEPI sold to EnerVest. Thus, the 1962 JOA's ROFR affected TEPI's entire working interest under that JOA. Accordingly, when TEPI sold that working interest to EnerVest after offering to sell the Fordoche Group only a lesser interest, viz., TEPI's share of the unitized substances, it breached that ROFR. Alternatively, TEPI breached that RFOR by effectively transferring to EnerVest the right to control and use the tangible facilities and the surface rights necessary to their use after specifically excluding them from the property it offered to sell to

5

the Fordoche group;

(b) TEPI failed to perform its obligations under the ROFRs because it transferred property affected by the Fordoche's preferential rights without ever making an offer to sell any certain or definite thing or property interest to the Fordoche group;

(c)TEPI breached the ROFRs by selling the property affected by the Fordoche group's preferential rights to EnerVest for a lesser price than TEPI asked in its offer to the Fordoche group.

(2) TEPI breached its duty to act in good faith with respect to its performance of its obligations under each of the ROFRs by:

(a) substantially increasing the price in its offer to the Fordoche group between March 1, 2000, and April 26, 2000 with the intention of discouraging the Fordoche group's exercise

6

of their preferential rights; and

(b) making misrepresentations to the Fordoche group regarding its ownership interest in certain tangible and intangible property associated with the production units, as well as misrepresentations regarding the productivity of certain wells.

## Facts

Defendant TEPI and plaintiffs, the Fordoche group, along with many others not parties to this suit, separately owned mineral leases that gave them working interests[1] in respect to four different production units in the Fordoche Field in Point Coupee Parish, Louisiana. The purpose of these production units was to allow working interest owners to extract certain types of minerals from designated

---

[1] A working interest is defined as, "The rights to the mineral interest granted by an oil-and-gas lease, so called because the lessee acquires the right to work on the leased property to search, develop, and produce oil and gas, as well as the obligation to pay all costs. -- Also termed leasehold interest; operating interest." Black's Law Dictionary, (8th ed. 2004).

7

sands underlying particular tracts of land.  Because no party contends otherwise, we infer that each mineral lease involved in this case is a standard contract whereby the lessee has the right to: (1) explore for and extract oil, gas, or other minerals; (2) make reasonably necessary use of the surface of the lands affected for those purposes; and (3) assign or transfer those rights to other persons.

TEPI, the Fordoche group, and the non-party lease owners were parties to four different joint operating agreements (JOAs) formed by them or their predecessors for the purpose of producing minerals from the four unitized sands.  The function of a JOA is to spell out each party's rights and duties with respect to drilling, development, operations and accounting in connection with each production unit.  The following provides the dates of execution of each JOA and the property affected by each JOA:

(1) August 29, 1962 JOA is for the Pressure

8

Maintenance Unit "K" and Upper Dearing Sands and covers the Commingling Facility No. 8 and the following wells:

* J.O. Long Well #2-D

* J.O. Long Well #5-D

* J.O. Long Well No. 8

* L.E. Carpenter Well #1-D

* Clark Heirs Well #2

(2) May 1, 1969 JOA is for the Long RA SU A and covers the following wells:

* Price U1 Well #1

* Price J.O. Long Well #9-D

* U2 Well #1 & 1 Alt.

* Long RA SU A#2-A

(3) December 1, 1969 JOA is for the "L" Sand Unit and covers the following well:

* Fairchild-Chauvin U1 Well #1

(4) November 14, 1995 8000 RA SUA Operating Agreement covers and affects the following wells:

* J.O. Long Well #7-D

* J.O. Long Well #11

* Clark Heirs Well #1

* Clark Heirs Well #3

* Fairchild-Chauvin Well U2-1 Alt.

* B.W. Dreyfus Well #1-A

* Mrs. Rap Price Well #1

* Clark Duckworth U2 #1

All four JOAs at issue have common features regarding the "operator." First, each JOA details the selection process of an operator in addition to explaining the power of this position. Under the JOAs, the operator is designated as TEPI. Further, the JOAs provide that the operator, while under the ultimate direction and control of the directives of the JOA, is nevertheless authorized to manage and supervise the day-to-day operations of the production unit. Second, each JOA provides a replacement process available to the owners of a majority of the

10

combined working interests upon a vacancy in the position; said majority is empowered to elect another owner as TEPI's successor. Third, the JOAs authorize the operator to develop and operate the Unit Area for the production of Unitized Substances for the joint account of the parties. Finally, each JOA provides that the property and equipment acquired by the operator or the parties for the purpose of exploring for and producing minerals within each respective unit shall become the property of the parties of each JOA as co-owners in indivision.[2]

The ROFR clauses in the four JOAs are similar except for one major difference. The August 29, 1962 JOA provides that the ROFR applies to the sale by a party of "its interest, in whole or in part, in the properties affected by this agreement." By contrast, the other three JOAs provide that the ROFR will extend to the sale of any part of a party's specified

---

[2] See La. Civ. Code art. 797 *et seq.*

11

interest in "unitized substances."[3]

In 1999, TEPI decided to offer for sale to selected prospects its entire working interests in 16 oil and gas fields in Louisiana for the highest lump sum bid in a global transaction called the "Gulf Coast Package." The Gulf Coast Package included, among others, the Fordoche Field. TEPI solicited bids on the Gulf Coast Package, and EnerVest was the successful bidder with an offer of approximately $78.7 million. Of the $78.7 million paid to TEPI, EnerVest initially allocated $1,998,811 as the value of the property subject to the Fordoche group's preferential rights and advised TEPI of that allocated price. As part of the sale, EnerVest also agreed to indemnify TEPI in the event of incurred liability as a result of the ROFR clauses.

On March 1, 2000, TEPI, in writing, offered

---

[3] Unitized substances, under the JOAs, are defined as, "all gas and condensate in and which may be produced and saved" for the sands underlying the unit area referenced by the JOA.

appellants the opportunity to purchase, at EnerVest's allocated price ($1,998,811), TEPI's undefined interests in the property. Mr. Ronnie J. Theriot, one of the plaintiffs, responded with questions regarding the property offered to them and why and how the price had been determined as the "allocated" price. TEPI sent subsequent offer letters to the appellants on April 26, 2000, purporting to clarify the property interests offered and stating an allocated price of $2,014,861.[4] On May 22, 2000, the appellants again responded with an inquiry regarding how TEPI arrived at the allocated value, and whether the value reflected the price that EnerVest was offering to pay for the specified assets. The Fordoches requested an additional thirty days to

---

[4] TEPI sent separate, identical letters to Fordoche, Inc. and the Theriots. The letters essentially explain that most, but not all, of Fordoche Field is covered by the Fordoches' preferential rights. Upon researching the various JOAs, TEPI realized that additional preferential rights were applicable, and therefore, TEPI adjusted the previous allocated value. The letter then lists the assets under each JOA that were subject to preferential rights and gives an allocated value for each JOA. The total of those allocated value equals $2,014,861.

13

adequately research the matter in order to determine whether to exercise or waive their preferential rights. TEPI sold its interest in the Fordoche Field to EnerVest on December 22, 2000, seven months after the appellants' request.

## Standard of Review

This Court reviews the district court's grant of summary judgment *de novo*, applying the same standard as the district court.[5] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[6] A fact is material only when it might affect the outcome of the suit under the governing law, and

---

[5] *Gowesky v. Singing River Hospital Systems*, 321 F.3d 503, 507 (5th Cir. 2003).

[6] Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).

14

a fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party.[7]

The evidence should be viewed in the light most favorable to the non-movant.[8]  If the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[9]

## Analysis[10]

*A. TEPI's Breach of the Right of First Refusal*

The right of parties to contract for a "right of first refusal" has been recognized by Louisiana

---

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[8] *Duckett v. City of Cedar Park, Texas*, 950 F.2d 272, 276 (5th Cir. 1992).

[9] *Allen v. Rapides Parish Sch. Bd.*, 204 F.3d 619, 621 (5th Cir. 2000).

[10] The federal courts are empowered by 28 U.S.C. § 1332 to hear this suit as the parties to it are diverse and the amount in controversy exceeds $75,000.  Under the holding of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817 (1938) and Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 61 S. Ct. 1020 (1941), we must apply Louisiana's obligations and mineral law.

courts for some time.[11]  In 1993, the jurisprudence was codified by the Louisiana Legislature in Louisiana Civil Code articles 2625 and 2626.  Article 2625 provides:

> A party may agree that he will not sell a certain thing without first offering it to a certain person.  The right given to the latter in such a case is a right of first refusal that may be enforced by specific performance.

Article 2626 provides:

> The grantor of a right of first refusal may not sell to another person unless he has offered to sell the thing to the holder of a right on the same terms, or on those specified when the right was granted if the parties have so agreed.

It is apparent that the driving intent of the four JOAs was to provide appellants with a right of first refusal.  What is at issue regarding the breach of the ROFRs is as follows:

_____

[11] *Ebrecht v. Pontchatoula Farm Bureau Assoc., Inc.*, 498 So.2d 55 (La. App. 1st Cir. 1986); *Crawford v. Deshotels*, 359 So.2d 118 (La. 1978); *Price v. Town of Ruston*, 171 La. 985, 132 So. 653 (La. 1931).

(1) the "thing" that is the subject of the ROFR under Article 2625;

(2) whether TEPI clearly and unambiguously described the property offered to appellants in its March 1, and April 26, 2000 offer letters;

(3) whether TEPI offered the same "thing" to appellants, the holder of the right, on the same terms, before selling to Ener Vest

1.   The "Thing" Subject to the ROFR

According to Article 1983, "Contracts have the effect of law for the parties...."  Therefore, to determine the "thing" upon which the right of first refusal was granted, we must turn to the language in each of the four JOAs.

A. The 1962 JOA

The 1962 JOA provides:

Before the sale to a third party by any Operating Party of its interest, in whole or in part, in the properties affected by this agreement, the other Operating Parties shall

be given the refusal thereof at the best price offered in good faith by a third party, and such other Operating Parties shall have the preferred right to purchase at the price stated, which right shall be exercised within thirty (30) days after receipt of written notice of the offer made by a third party....

It is self-evident that the 1962 JOA extends appellants' ROFR to TEPI's entire working interest in its mineral leases subject to that JOA. The text of that agreement provides, "before the sale to a third party...of *its interest*...in *the properties affected by this agreement*." (Emphasis added).

TEPI violated the August 29, 1962 JOA by failing to offer the entirety of its interest in the property affected by the JOA to the Fordoche group, yet thereafter selling the entirety to a third-party buyer, EnerVest. The April 26, 2000 offer letter states,

The following facilities are either owned entirely by TEPI, or if jointly owned, not subject to any preferential right to purchase. These facilities will be conveyed to EnerVest. Additionally, none of the rights of way, pipeline

18

> rights of way and surface leases listed on Schedule B to the Agreement are subject to the preferential right to purchase. As your preferential right to purchase does not include all facilities or any rights of way, should you elect to exercise your preferential right to purchase, you will need to enter into a production handling agreement with EnerVest.

Thereafter, TEPI lists eleven tangible properties that are excluded from the appellants' ROFR.

This April 26, 2000 letter indicates that TEPI was offering to sell the Fordoche group something less than TEPI's entire working interest under the 1962 JOA. In fact, the district court in its reasons for summary judgment and TEPI in its brief in this court assert that the ROFR in the 1962 JOA only grants to each party the preferential right to purchase a departing party's interest in the unitized substances. However, the 1962 JOA clearly and unambiguously provides to the contrary The ROFR extends to all of each party's property interests affected by the JOA; that plainly includes each party's undivided interest in the tangible and

19

intangible assets acquired and employed for the operation of the production unit, as well each party's rights as a mineral lessee or owner of another mineral interest.  The ROFR is certainly not limited to each party's interest in the unitized substances according to a plain reading of the 1962 JOA.

The April 26, 2000 letter illustrates that TEPI offered to appellants an opportunity to exercise preferential rights on *only some* of TEPI's interests in the properties affected by the August 29, 1962 JOA.  In contrast, TEPI offered and sold to EnerVest the *entirety* of its interest.  This differentiation directly contravenes the JOA which requires that, "...Before the sale to a third party by any Operating Party *of its interest, in whole or in part, in the properties affected by this agreement*, the other Operating Parties shall be given the refusal thereof at the best price offered in good faith by a third

party." (Emphasis added).

Had TEPI offered its entire working interest to the appellants and had appellants purchased it, they would have had the right, under the 1962 JOA, to elect the successor operator to the vacancy left in that position by the departure of TEPI, and thereby to take control of the production unit subject to that JOA.

### B. The Other Three JOAs

The ROFR clauses in the remaining three JOAs read,

> Before the sale of, and their assignment by any party of all or any part of its interest in Unitized Substances, the other party or parties shall be given the preferential right of the refusal of the purchase of such interest at the minimum sale price placed thereon by the party offering such interest for sale, and any one or more of the parties desiring to purchase such interest shall have the preferential right to purchase at said price....

The parties agree that the unitized substances are defined in each of the three JOAs as all oil, gas,

21

and other hydrocarbons in and which may be produced and saved from the specific unit to which the JOAs apply. In its offer letter, TEPI simply offered the Appellants the opportunity to exercise their preferential rights to the property covered in each of the three similar JOAs for prices stated as follows:

(a)Those covered in the May 1969 operating agreement for $10.00;

(b)Those covered in the December 1969 operating agreement for $10.00;

(c) Those covered in the November 1995 operating

agreement for $1,998,821.00.

TEPI's letters stated that it would be necessary for the Appellants to enter into a production handling agreement with EnerVest if it exercised its preferential rights because the tangible assets on premises formerly used for that purpose under all

22

four JOAs were being conveyed in full ownership to EnerVest.

TEPI argues that it was only required to offer to the Appellants its interest in the unitized substances, and that the tangible assets were not subject to the Appellants' right of first refusal. It is true that this language of the three similar JOAs presents a complication because, rather than referring to the "properties affected by this agreement," these JOAs at first blush appear to restrict the parties' preferential rights to the acquisition of percentages of interests in the unitized substances. However, when the JOAs are considered in their entirety, it does not necessarily follow that TEPI's argument presents the most reasonable interpretation of the JOAs.

In any event, each of the three JOAs in which the ROFR clause refers to "unitized substances" provides in essence that each party participates in the

acquisition of ownership of any tangible property associated with unit drilling and production operations by the same percentage as it enjoys in the minerals produced.  For example, Article 3 of the November 14, 1995 JOA, entitled "Percentage of Interest," states:

> 302.  The parties shall also own all wells drilled hereunder, and the property and equipment acquired hereunder, in the above proportions, unless specifically provided otherwise herein.

Thus, the parties not only own and participate in the production of the minerals in the wells covered by the JOAs; they also co-own the tangible exploration and production equipment and property in those same proportions.  The JOAs merely authorize the leaseholders, under specified circumstances, to appoint or elect a successor operator to use those tangible assets. The JOAs do not authorize anyone to

24

divest any party of its co-owned undivided interest in the tangible assets or to convey that interest to a third party or the operator. Accordingly, TEPI was not authorized to sell the entirety of any tangible asset on the premises covered by the JOAs because all of the working interest owners held an indivisible interest in those tangible assets.

Furthermore, as was the case with the August 29, 1962 JOA, each of the other three JOAs sets forth a method by which a successor operator is to be chosen by agreement of the parties to the JOA. As indicated above, TEPI's purported exclusion of the tangible assets from its offer to the Fordoche group made TEPI's proposition to that group less attractive than, and unequal to, its sale to EnerVest. This is because the unqualified sale of the entire working interest to EnerVest gave it effective ownership and control of each JOA's production unit; whereas, TEPI's ambiguous offer to the Fordoche group would

have allowed them to acquire with certainty only additional shares of participation in the production of the unitized substances.

2. The Failure to Specify the Property Being Offered by TEPI in the April 26, 2000 Offer Letter

Despite our diligent efforts, we find no documentation in the record showing that TEPI unambiguously specified the particular property interest being offered for sale to appellants. Without such documentation, it is difficult to see how we could determine that, as a matter of law, TEPI complied with the contractual ROFRs in the JOAs. Further, comparison of TEPI's letters calling on the Fordoche group to exercise or waive its preferential rights with other evidence in the record only leads to the discovery of additional disputed facts that are material.

TEPI's April 26, 2000 offer letter manifests its intent to supplement and clarify its March 1, 2000

offer letter that TEPI had discovered was incomplete. The caption of the April 26 letter refers to "PRODUCING PROPERTY SALES/Preferential Right to Purchase/Fordoche Field/ Point Coupee Parish, Louisiana." The body of the April 26, 2000 letter merely does the following: (1) describes each of the four JOAs; (2) lists the well names and numbers subject to each JOA; (3) states the 30-day election period to exercise the ROFR; and (4) lists the allocated value[12] of the unnamed property being offered.

Further, the April 26, 2000 excludes the tangible facilities from the offer made to the Fordoche group, as follows:

> [The following property is] either owned entirely by TEPI, or if jointly owned, not subject to preferential right to purchase. These facilities will be conveyed to EnerVest. Additionally none of the rights of way, pipeline rights of way and surface leases listed on Schedule B to the Agreement are subject to the preferential right to

---

[12]*See* offer letter, "Allocated value is $1,998,821.00."

purchase. As your preferential right to purchase does not include all facilities or any rights-of-way, should you elect to exercise your preferential right to purchase, you will need to enter into a production handling agreement with EnerVest.

The letter then lists tangible property to which the aforementioned paragraph refers. This provision, which itself is the subject of a genuine dispute between the parties, describes property excluded from the offer letter and does not help to clarify the exact property interests offered for sale to the Fordoche group.

The April 26, 2000 letter also refers to "an extract of the Agreement" to be sent apparently under separate cover, as follows:

With this clarification, we are re-offering the preferential rights to purchase as set out in this letter to you. Additionally we are resending an extract of the Agreement for your review as described below. Please carefully review the Agreement and its attachments to understand the rights and obligations you would assume should you exercise your preferential right to purchase. These obligations include, but not limited to: (1) your assumption of the plugging and

abandonment liabilities and obligations; (2) your assumption of environmental obligations as they are defined in the Agreement; (3) the requirement to establish an escrow account; and (4) the requirement to post a Performance and Payment Bond. Should you exercise your preferential right to purchase, you will be required to close the transaction within thirty (30) days of your election.

This "extract of the Agreement" has not been included in the record.

The April 26, 2000 letter closes with a request that each of the Fordoche group elect to exercise or waive its preferential rights to purchase by signing the bottom of the letter and marking on a check off list. The check off forms are no more helpful than the letter in describing the specific property interest TEPI offered to sell the Fordoche group. For example, the check off list for exercising preferential rights simply provides:

[    ] hereby elects to exercise its Preferential Right to Purchase the following interests:

29

_____ 8000 RA SU A

_____ Operating Agreement, dated August 29, 1962          []Unit "K" and Upper Dearing Sands

_____ Long RA SU A

_____ L Sand Unit

This list identifies only the JOAs, the production units, and sands from which minerals were being produced.

In sum, we see nothing in the April 26, 2000 offer letter from TEPI to the Fordoche group that unambiguously describes the legally recognized property interest offered for sale, such as, for example, "unitized substances," "working interests,""leasehold interests," or "mineral leases." Furthermore, the record is replete with evidence that Ronnie J. Theriot, after receiving the April 26, 2000 letters, was uncertain as to the property interest offered for sale by TEPI. Mr. Theriot communicated his concerns over the lack of

specific information in the letter via his counsel in correspondence to TEPI. Mr. Theriot was particularly concerned by how and by whom the "allocated value for the interest" had been derived. As he explained in his deposition, "I had no idea what was being offered, what was being paid, what the terms or the conditions were or anything." Further, he stated, "...I said, 'What is it? What is it that's being offered? What is it that you're offering to sell? What is the price? What's the terms? What's the conditions?...What is the offer? Show me the offer and I'll decide whether or not I want to match it.'" "Additionally, [he stated,] and contrary to the sworn affidavit of Pam Bikum, I discussed these matters with her and she could not explain exactly what was being offered pursuant to the preferential rights." This evidence supports the assertion that Fordoche group was not given specific information regarding the property interests for sale.

Note, however, that there is a factual dispute as to the truth or falsity of Mr. Theriot's testimony. His statements are directly refuted by the affidavit of Ms. Pamela Bikum, Senior Land Representative for Chevron TEPI North America Upstream Division, Deepwater Land Department. She stated, in pertinent parts, that the appellants "were offered the opportunity to exercise their preferential rights, and to thereby purchase, the Unitized Substances subject to" the four JOAs; and that "[t]o the best of my recollection, no one from Fordoche [neither Ronnie Theriot nor Rebecca Theriot] ever called me to ask any questions about the Offer Letters." These statements indicate factual disputes regarding the clarification of the April 26, 2000 letters; their existence makes summary judgment inappropriate, as well.

Without an unambiguous written document in the record showing that TEPI clearly described the

32

particular property interests for sale in its offer to the Fordoche group, we cannot conclude as a matter of law that TEPI complied with the ROFR clauses in the JOAs. Although TEPI might be able to introduce other evidence to overcome this deficiency at trial or in further proceedings in the district court, the vague, general offer letters it sent to the plaintiffs do not give it a solid basis upon which to build.

3. The Failure of TEPI to Offer the "Thing" to Appellants on the Same Terms as It Sold to EnerVest

As mentioned above, though it is unclear exactly what type of property interest TEPI offered appellants the right to purchase, it is clear that it was *less* than the entirety of its working interest in Fordoche Field. Yet, TEPI offered and sold to EnerVest its full interest in the same. As discussed above, this constitutes a breach of the 1962 JOA. Beyond this, however, it may be reasonably inferred

that TEPI breached all four JOAs by failing to offer the same thing for the same price to both the Fordoches and EnerVest.  It is apparent that under the basic principles of the ROFR, TEPI was obligated to first offer to appellants the same thing it offered to EnerVest *at the same price.*

TEPI sold EnerVest the *entirety* of its interest in the Fordoche Field portion of the Gulf Coast Package for $2,014,861.  This exact price was quoted by TEPI to appellants  as the amount they must pay for a property interest that was substantially *less valuable than the entirety* of TEPI's working interest. TEPI's offer of sale to the Fordoche group excluded:

(1) tangible facilities purportedly owned by TEPI exclusively or not subject to the preferential right to purchase, i.e., equipment, structures, and other tangible interests related to each unit;

34

(2) rights of way; and

(3) pipeline rights of way.

Therefore, had appellants exercised their preferential rights, they would have paid for those limited rights the same amount EnerVest paid in acquiring unqualified ownership of TEPI's entire working interest in the leases subject to the JOAs. The CEO of EnerVest testified that ten to fifteen percent of the price allocated to the four JOAs was attributable to the tangible property associated with the production units. That leaves only 85 to 90 percent of the allocated price attributable to the interests offered to the appellants. Plaintiff Ronnie J. Theriot, echoed this sentiment in his deposition by stating that the tangible facilities themselves are "worth millions of dollars." Thus, it is undeniable that EnerVest, in its purchase of TEPI's interest received what the Fordoche group was offered (and then some) for a lesser price.

## Conclusion

As a result of the numerous breaches by TEPI that a reasonable trier of the facts could infer from this record, we cannot affirm the grant of summary judgment by the district court. Thus, the current record reflects that TEPI may have breached the August 29, 1962 JOA by excluding certain assets from its offer to the Fordoche group; by not specifying the property to which its April 26, 2000 offer letter applied; and by selling to EnerVest the same thing offered to the Fordoche group, but at a lower price.

*B. TEPI's Breach of the Obligation of Good Faith*

Louisiana's Civil Code specifically provides that good faith is an additional requirement to every obligation and contract. Article 1759, found in "General Principles of Obligations," provides, "Good faith shall govern the conduct of the obligor and obligee in whatever pertains to the obligation." Similarly, Article 1983, found in "Effects of

36

Conventional Obligations," provides, "...Contracts must be performed in good faith." Because Louisiana law imposes a duty of good faith upon all parties, explicit reference in a contract to such or lack thereof is irrelevant.

Good faith is not defined in the Civil Code but as explained by Professor Saul Litvinoff,

> ...as understood in modern law, good faith binds the parties to a contract to cooperate with each other in order to attain the mutual end for which they entered into the agreement. In that perspective, an obligee who, without justification, prevents the obligor's performance, or conceals from the obligor facts that, to the obligee's knowledge, would cause the obligor to fail to perform, or even facts that would make the latter's performance exceedingly difficult, thereby refuses the cooperation he owes the obligor...[13]

Within the record, there are several implications of TEPI's bad faith, i.e., evidence that leads to the inference that TEPI did not cooperate with the Fordoche group to attain the mutual end for which

---

[13] 6 Saul Litvinoff, <u>Louisiana Civil Law Treatise Part II,</u> § 5.32 (2d ed. 2001).

37

they entered into the ROFRs. These implications can be categorized in two ways: (a) with regard to the price offered, both the source of it and its increase between March 1, 2000 and April 26, 2000; and (b) with regard to misrepresentations made by TEPI to the appellants, including its claims of full ownership of the surface rights and tangible property and also its statements addressing the functionality of certain wells. This conduct by TEPI inferentially breaches the good faith obligation imposed by the Louisiana Civil Code.

## 1. The Price

Appellants assert the source of the price for which TEPI offered to sell them was simply EnerVest's extrapolation from the total package sale price. By doing so, Fordoche asserts that TEPI falsely inflated the price quoted to the Fordoche group, arguably spurred by its motivations to discourage Fordoches' acceptance of that offer. Furthermore, TEPI

increased the offer price from $1,998,811 on March 1, 2000, to  $2,014,861 on April 26, 2000.

## 2. Misrepresentations

Appellants additionally argue that TEPI made misrepresentations to them, which led to a sense of distrust on their part. First, TEPI represented that it was the sole owner of surface use rights, tangible equipment, structures, and property formerly used under the JOAs.  This is evidenced by the April 26, 2000 offer letter in which TEPI specified that "[t]he following facilities are either owned entirely by TEPI, of if jointly owned, not subject to any preferential right to purchase.  These facilities will be conveyed to EnerVest."  TEPI transferred property over which it did not have full ownership to EnerVest.   Under  the  JOAs,  certain  property associated with the production units was, in essence, co-owned by all the parties to the JOA.  Mr. Theriot stated, "it [the offer letter] specifically says I do

39

not [have any ownership interest in any of the facilities]." TEPI had no legal right to transfer that property without the concurrence of the other co-owners. Inferentially, by misrepresenting its legal rights, TEPI acted in bad faith.

Second, TEPI's offer letter indicated certain wells were no longer functional when, in fact, evidence in the record indicates that they were. TEPI noted in the April 26, 2000 offer letter that the wells in question, "have been depleted and inactive for some time." However, Mr. Theriot's affidavit provides, "[a]fter the sale, EnerVest, in fact, operated several of these 'depleted' wells and produced substantial oil and/or gas."

Taken together, the conduct of TEPI regarding the price of the property as well as the misrepresentations it made to the Fordoche group lead us to infer that there is a genuine dispute as to whether TEPI violated its obligation of good faith.

## Conclusion

The district court granted summary judgment dismissing Fordoche group's claims with prejudice. But as explained, genuine issues for trial exist regarding whether TEPI honored the requirements of the four ROFRs in the JOAs at issue in this case. On the present record, we cannot conclude as a matter of law that TEPI performed its obligations in good faith under the ROFR clauses in the JOAs. Accordingly, the district court's grant of summary judgment in favor of TEPI is REVERSED and this case is REMANDED to the district court for further proceedings not inconsistent with this opinion.

REVERSED and REMANDED.

41