Ronald **RHODE**, Plaintiff-Appellee,

v.

Rathell **DENSON** and San Jacinto
County, Defendants,

San Jacinto County,
Defendant-Appellant.

No. 84–2586.

United States Court of Appeals,
Fifth Circuit.

Nov. 5, 1985.
Rehearing and Rehearing En Banc
Denied Dec. 3, 1985.

Mehaffy, Weber, Keith & Gonsoulin, O.J.
Weber, Arthur R. Almquist, Beaumont,
Tex., for defendant-appellant.

Malone, Walsh & Wright, Harry H.
Walsh, III, Huntsville, Tex., for plaintiff-appellee.

Before GOLDBERG, JOLLY and
HIGGINBOTHAM, Circuit Judges.

## OPINION

PATRICK E. HIGGINBOTHAM, Circuit
Judge:

We face again the troublesome issue of
whether an episodic but tortious and unconstitutional act of an elected county official
is chargeable to the county as its policy
under *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98
S.Ct. 2018, 56 L.Ed.2d 611 (1978). Persuaded that the unconstitutional acts of
Rathell Denson, an elected constable of
Precinct 4 of San Jacinto County, Texas,
did not reflect county policy, we reverse
the judgment for money damages entered
against the county upon a jury verdict.

I

San Jacinto County, a rural county with
fewer than 10,000 residents, is located
north of Houston in East Texas. Like every Texas county before January 1, 1984, it
was required to have four justice of the
peace precincts and an elected constable in
each precinct. TEX.CONST. art. 5, § 18.
In 1977, Rathell Denson was elected constable of its Precinct 4. The events behind

this suit occurred the night of December 13, 1980. Our description adopts the version of the facts favorable to the jury verdict.

Ronald Rhode was driving westbound on highway 190 when he came upon Denson's car and passed it on the right-hand shoulder of the road. When Denson gave chase, Rhode stopped. Not knowing that Denson was a constable, Rhode sped away when Denson approached with what appeared to be a gun. Denson resumed the chase, firing his gun several times at Rhode's car. When Rhode's car left the road and hit a tree, he ran to a nearby house hysterically explaining that someone was trying to kill him. The startled residents, the Gladdens, called the county sheriff's department. When a deputy sheriff arrived, Rhode was arrested for evading arrest and passing on the wrong side of the road. In view of Rhode's frightened condition, Mr. Gladden asked that Rhode be taken to San Jacinto County by the deputy rather than by Constable Denson. The deputy complied, but once inside the county line, Rhode was transferred to Denson's car. Threatening him along the way, Denson drove Rhode to the county jail, placed him in a cell without medical attention, and left him to wash the blood from his face with water from the toilet. Some hours later, at about 5:00 a.m., his former wife obtained his release.

Rhode sued Denson and San Jacinto County under 42 U.S.C. § 1983 and 28 U.S.C. § 1343. The jury found that Denson, under color of state law and in bad faith, deprived Rhode of his constitutional rights while apprehending and arresting him. Rhode suffered $150,000 in damages for which San Jacinto County and Denson were held jointly and severally liable. The jury also found Denson's acts were committed "intentionally, maliciously, recklessly or in callous disregard of the civil rights of Ronald Rhode" and awarded punitive damages of $3,000 against Denson individually. Only San Jacinto County appeals.

## II

The district court instructed the jury that the County could be liable if it had the duty to train and supervise Denson but failed to do so. The court's charge thus allowed the jury to conclude that failure to train would support county liability without evidence of gross negligence. Rhode concedes that the charge was in error, given *City of Oklahoma City v. Tuttle,* —— U.S. ——, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), but argues that he is nonetheless entitled to judgment on the jury verdict because the County is liable as a matter of law. His argument has two distinct strands. First, he asserts that a Texas constable is a policymaking official of a county. Second, he asserts that every decision of such official made within the general ambit of his authority is an expression of policy.

■ Rhode's second assertion is an attempt to escape application of the rule that protects counties from vicarious liability. *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036. He argues that because a constable is a policymaking official, his every tortious act committed within the general ambit of his authority is a policy decision, which exposes the County to direct liability. Of course, in a finite sense every decision by a policymaker is one "promulgated by the ... lawmaking officers, or by an official to whom lawmakers have delegated policy-making authority." *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir.1984) (en banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). At the same time, imposing liability upon a county for an episodic tort by such officials is functionally indistinguishable from the imposition of vicarious liability. Nor does a discrete tort express policy in the sense that it sets a course or connects discrete dots to form a discernible line. Whatever the merit of the argument that every act of a policymaking official is policy, we do not reach it. We are unpersuaded that a constable of a Texas county precinct occupies a relationship to the County such that his edicts or acts may fairly be said to represent official county policy.

Rhode argues that the office of constable is analogous to that of county sheriff or

county treasurer, whose holders obtain "policymaking authority by virtue of the office" to which they are elected. *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir.1984) (en banc) (denying reh'g (with opinion)), *cert. denied,* —— U.S. ——, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). The County denies that a constable holds such a position and points out that although the commissioners' court disburses his salary, the commissioners' court and the county judge have no supervisory authority or other direct superintendence over the constable's training, qualifications, or the manner in which he performs his constable duties.

We have defined official policy to be:

A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority;

*Id.; see also Webster v. City of Houston,* 735 F.2d 838 (5th Cir.1984) (en banc).

■ In *Familias Unidas v. Briscoe,* we considered the liability of a Texas county for the acts of a county judge:

Because of the unique structure of county government in Texas, the judge—*like other elected county officials, such as the sheriff and treasurer*—holds virtually absolute sway over the particular tasks or areas of responsibility entrusted to him by state statute and is accountable to no one other than the voters for his conduct therein. Thus, at least in those areas in which he, alone, is the final authority or ultimate repository of county power, his official conduct and decisions must necessarily be considered those of one "whose edicts or acts may fairly be said to represent official policy" for which the county may be held responsible under section 1983.

619 F.2d 391, 404 (5th Cir.1980) (emphasis added) (citations omitted).

Not every elected county official holds full sway over the tasks entrusted to him. Moreover, whether an official has the power to make policy cannot always be answered by the official's apparent place in a hierarchical scheme. In the present context, for example, the county commissioners and county judges are the primary governing officials of a county. Unlike a county judge, the constable's constituency was not county wide. Denson was elected by the voters of a precinct as one of four such officials in the County. Yet while Denson was constable for county precinct number four, not the entire County, he could serve process and make arrests and otherwise carry out the duties of a peace officer throughout the County. While a constable must obtain the funding for his office from the commissioner's court, only judges of a state district court, with districts that may include several counties, may remove him from office. TEX.CONST. art. 5, § 24.

The determining factor, however, is neither that a constable is elected by voters from a subunit of the County nor that the commissioner's court controls his salary. The critical circumstance is that Denson, as a constable of a precinct, was not given that discretion, or range of choice, that is at the core of the power to impose one's own chosen policy. It is true that a constable possesses a limited range of choice, which is essential even to virtually ministerial tasks. But a constable's range of choice is no greater than that, for example, of a peace officer who must decide whether to arrest for a misdemeanor committed in his presence. The constable's duties, which include making arrests and serving warrants and process, *see* Tex.Rev.Civ.Stat. Ann. art. 6885 (Vernon 1960); Tex.Code Crim.Proc.Ann., arts. 2.12, 2.13 (Vernon 1977 & Supp.1985); *Lawyers Civil Process, Inc. v. State,* 690 S.W.2d 939, 941–42 (Tex. App.—Dallas 1985, no writ), are to be contrasted with those of the county judge, sheriff or county treasurer, *see Familias Unidas, supra.* Their power to make and enforce policy, unlike the constable's narrowly circumscribed duties, is marked by authority to define objectives and choose the means of achieving them. *See Bennett v. City of Slidell,* 728 F.2d 762, 796 (5th

Cir.1984) (en banc), *cert. denied,* — U.S. ——, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985).

■ Rhode points to the seeming independence of a Texas constable and to the lack of superintendence by the county court. But a person who lacks the power to make policy does not become a policymaker simply because he answers to voters rather than to another official. Direct election of school janitors or toll takers or surveyors answerable only on recall would not make them policymakers. As we explained in *Bennett v. City of Slidell:*

> [P]olicymaking authority is more than discretion, and it is far more than the final say-so, as a matter of practice, on what water main will be replaced today and whether a building meets city construction standards. City policymakers not only govern conduct; they decide the goals for a particular city function and devise the means of achieving those goals. Policymakers act in the place of the governing body in the area of their responsibility; they are not supervised except as to the totality of their performance.

728 F.2d at 769.[1]

San Jacinto County points out it does not have the right to create and supervise its own police force. The Texas Constitution instead provides that the voters of a county shall elect a sheriff "whose duties and perquisites and fees of office, shall be prescribed by the Legislature, TEX.CONST. art. 5, § 23, and provides for the election of a constable in each precinct of a county, *id.* § 18. The County argues that Denson was enforcing state law when he arrested Rhode and that the acts of a state-created official discharging state duties ought not be chargeable to the county.

In *Familias Unidas,* 619 F.2d at 404, we held that because the county judge's actions were confined to implementing a state statute, in contrast to "his traditional role in the administration of county government or to the discretionary powers delegated to

him by state statute in aid of that role," the county judge was effectuating state not county policy. Under *Familias,* Denson, as an official at least subordinate to the county judge in the power to effectuate county policy and discharging state duties, *a fortiori* could not alone make policy for San Jacinto County. We expressly affirmed *Familias* in *Bennett v. City of Slidell,* 728 F.2d 762 (5th Cir.1984) (en banc), *cert. denied,* — U.S. ——, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). But *Familias* is not the last word. In *Crane v. State of Texas,* 759 F.2d 412, *vacated in part on other grounds,* 766 F.2d 193 (5th Cir.1985), we held that a district attorney discharging state law nonetheless effectuated county policy. We need not reconcile these holdings today. Whether or not a county official discharging a duty imposed by state law can ever be considered a county policymaker, we hold that Denson, as a constable, lacked the power to make county policy.

**REVERSED.**

GOLDBERG, Circuit Judge, dissenting:

With his usual accuracy and clarity, Judge Higginbotham has set out the facts that are beyond dispute. Because I detect a corresponding absence of those qualities in the majority's exposition of the law, and because the failure to hold San Jacinto County liable for the acts of its elected official Rathell Denson runs counter to *Monell, Bennett, Familias,* and *Crane,* I dissent.

*Bennett v. City of Slidell* tells us that there are essentially two ways in which a plaintiff can hold the county liable for the acts of its officials and employees. The first, which is not at issue in this case, is where a

> persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and

---

1. The dissent argues that every elected official who does not answer directly to another official is *ipso facto* a "policymaker" whose every act "in

his official capacity" should be attributed to the county. We disagree, for the reasons set out in this quotation from *Bennett.*

well settled as to constitute a custom that fairly represents municipal policy. 735 F.2d 861, 862 (5th Cir.1984) (en banc) (denying reh'g with opinion), *cert. denied,* —— U.S. ——, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985).

While this test presents difficult line-drawing problems as to what is "so common and well-settled as to constitute a custom," the second test, which is at issue here, presents far fewer line-drawing problems. In deciding whether the unconstitutional acts of Rathell Denson, an elected constable of Precinct 4 of San Jacinto County, reflect county policy, we need only determine whether his acts represent a

decision that [was] officially adopted and promulgated by the [county's] lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority.

*Id.*

The court in *Bennett* was principally preoccupied with the question of how the acts of *unelected* officials are to be attributed to a governing body. The court addressed the problem of *elected* officials by explicitly affirming "the writing in *Familias Unidas v. Briscoe,* 619 F.2d 391 (5th Cir.1980), as it relates to the officer who obtains policy-making authority by virtue of the office to which that officer is elected." *Id.* It is to *Familias* that I now turn.

The majority quotes the relevant language in *Familias,* but then proceeds to ignore it. I quote it again:

Because of the unique structure of county government in Texas, the judge—like other elected county officials, such as the sheriff and treasurer—holds virtually absolute sway over the particular tasks or areas of responsibility entrusted to him by state status and is accountable to no one other than the voters for his conduct therein. Thus, at least in those areas in which he, alone, is the final authority or ultimate repository of county power, his official conduct and decisions must necessarily be considered those of one "whose

edicts or acts may fairly be said to represent official policy" for which the county may be held responsible under section 1983.

619 F.2d 391, 404 (5th Cir.1980) (citations omitted), *quoting Monell v. Department of Social Services,* 436 U.S. at 694, 98 S.Ct. at 2038.

In *Crane v. State of Texas,* 759 F.2d 412 (5th Cir.1985), Judge Gee, writing for a unanimous panel, held that this language clearly covered the acts of a City District Attorney, whose

authority to establish County procedures for issuing misdemeanor capias [which procedures were challenged as unconstitutional] derived from the County office to which he was elected by County voters. * * * Because the ultimate authority for determining County capias procedures reposed in the District Attorney, an elected county official, his decisions in that regard must be considered official policy attributable to the County. As we stated in *Bowen v. Watkins,* 669 F.2d 979 (5th Cir.1982),

At some level of authority, there must be an official whose acts reflect governmental policy, for the government necessarily acts through its agents. Thus the question becomes one of identifying the official who has authority to make policy; then municipal liability attaches to acts performed pursuant to that policy. When an official has final authority in a matter involving the selection of goals or of means of achieving goals, his choices represent governmental policy.

669 F.2d at 989. The County in this case acted through the District Attorney; he selected the means by which the County was to achieve a sound and legally sufficient capias system. His choice of an unsound and legally insufficient system represents County policy for which the County is liable.

While a constable does not occupy a position as lofty as that of a county judge or district attorney,[1] he nonetheless, by virtue

---

1. The majority's *reductio ad absurdum* argument—"Direct election of school janitors or toll

of his elected position, "holds virtually absolute sway over the tasks or areas of responsibility entrusted to him by state statute and is accountable to no one other than the voters for his conduct therein." *Familias.* The majority acknowledges as much:

> [A]lthough the commissioners' court disburses his salary, the commissioners' court and the county judge have no supervisory authority or other direct superintendence over the constable's training, qualifications, or the manner in which he performs his constable duties. [*supra* at 109] * * * [W]hile Denson was constable for county precinct number four, not the entire County, he could serve process and make arrests and otherwise carry out the duties of a peace officer throughout the County. [O]nly judges of a state district court, with districts that may include several counties, may remove him [or a county judge] from office. TEX. CONST. art. 5 § 24. [*supra* at 109].

Perhaps because they recognize the force of what they are conceding, the majority writes that the "critical circumstance is that Denson, as a constable of a precinct, was not given that discretion, or range of choice, that is at the core of the power to impose one's own chosen policy." *Supra* at 109. The majority's test fails to support them here. As the Supreme Court remarked in another context about the powers of unelected peace officers, "[p]olice officers in the ranks do not formulate policy, per se, but they are clothed with authority to exercise an almost infinite variety of discretionary powers." *Foley v. Connelie,* 435 U.S. 291, 98 S.Ct. 1067, 1071, 55 L.Ed.2d 287 (1978) (discretionary powers listed) (alien rights case). *A fortiori,* an *elected* constable, whose term of office, along with those of county commissioners and justices of the peace, was increased in 1954 from two to four years "in the inter-

est of obtaining increased efficiency in the administration of county government," TEX.CONST. art. 5 § 18 (quoting interpretive commentary), exercises the same "almost infinite variety of discretionary powers."

Unlike an unelected, appointed police chief who can pass the buck to the mayor or aldermen, *see Brewer v. Blackwell,* 692 F.2d 387, 401 (5th Cir.1982), the county constable is the top dog in the areas of responsibility granted to him by virtue of his office. The bucks stop with him. When Rathell Denson decided that, in the exercise of his unsupervised and otherwise lawful power to arrest Rhode, he needed to shoot at Rhode's car and then place him in a cell without medical attention (where Rhode was forced to wash his wounds with water from a toilet), he exercised his "final authority in a matter involving the ... means of achieving goals." As such, "his choices represent governmental policy." *Crane v. State of Texas,* 759 F.2d at 430, *quoting Bowen v. Watkins,* 669 F.2d at 989.

Once it is determined that an elected official has acted by virtue of his office in the area over which he holds virtually absolute sway, it is irrelevant that his act was an isolated one. The act was the county's, and for the purposes of determining how to arrest someone who passes on the shoulder, Denson's decision to give chase, fire shots, and withhold medical attention was the county's decision. *Id.* When an elected official makes that decision, we do not require that he file away an embossed document stating that when someone passes him on the shoulder, he will give chase, fire shots, and withhold medical attention. As long as Denson was acting in his official capacity—and no one contends that he was not—his acts represent a "decision that

---

takers or surveyors answerable only on recall would not make them policymakers"—misses the mark. If the county by some political fluke chooses to elect school janitors, and those janitors are accountable to no one other than the voters, and a janitor somehow commits an un-

constitutional act in his or her official capacity as a janitor, *Familias* and *Crane* require that the county be held liable. Since these positions are not filled through the ballot box, we need not yet worry ourselves about them.

was officially adopted and promulgated." *Bennett,* 735 F.2d at 862.[2]

The majority's last line of defense is that "because the [constable's] actions were confined to implementing a state statute, in contrast to his 'traditional role in the administration of county government or to the discretionary powers delegated to him by state statute in aid of that role,' the [constable] was effectuating state not county policy." This argument fails for two reasons. First, Denson was indeed exercising his traditional role and those discretionary powers delegated to him by state statute in aid of that role.

Second, and more important, the majority indulges in the same misreading of *Familias* by the district court in *Crane* that the panel in *Crane* unanimously rejected. 759 F.2d at 430 n. 19. As the *Crane* panel pointed out, the county judge's implementation of state law in *Familias* was not attributed to the county for two reasons, neither of which has any relevance here. First, the constitutional violation in *Familias* was found in the state law itself, "for which the citizens of a particular county should not bear singular responsibility." *Familias* at 404. As in *Crane,* Denson here "failed to comply with a constitutional state statutory scheme; the error was in [his] interpretation, not in the scheme." *Crane,* at n. 19. Second, "the statute at issue in *Familias Unidas* was narrowly drawn, leaving little, if any, room for the exercise of discretion in its implementation." *Id.* By contrast, as I have argued above, Denson was required to exercise discretion in the manner in which he placed Rhode under arrest.

At the risk of boring the reader but confident of my good intentions, I return to *Crane* one last time:

> *Familias Unidas* cannot thus properly be construed to immunize local governments from § 1983 damage liability for actions within the discretion of their offi-

cials which prove to be both unconstitutional and illegal under state law. It stands rather for the unexceptionable proposition that local governments and their officials who act in conformance with a state statutory scheme will not be held liable for § 1983 damages if the scheme is later held unconstitutional. *Familias Unidas* therefore provides no support for the [majority's] finding in this case.

*Id.* Denson's unconstitutional acts were by no stretch of the imagination "in conformance with a state statutory scheme."

By virtue of his elective office, Rathell Denson was required to go about his duties as constable in a manner that comported with the federal constitution. Having elected someone who pursued his duties in an unconstitutional manner, the citizens of San Jacinto County are required by 42 U.S.C. § 1983 to bear the burden of their mistake. Because the majority concludes otherwise, I dissent.

**2.** The majority's statement that a "discrete tort [does not] express policy in the sense that it sets a course or connects discrete dots to form a discernible line" confuses the question of whether a person is a policymaker, with the question

of whether an act represents a "custom." The answer to the latter question provides a wholly distinct means of attributing liability to the county under *Monell* and *Bennett* and is not at issue here.