John MURPHY, et al., Plaintiffs,

v.

Michael Charles BUTLER, and Harris County, Texas, Defendant.

Civil Action No. H–05–2883.

United States District Court,
S.D. Texas,
Houston Division.

March 19, 2007.

Stewart Edmond Hoffer, Kenneth Howard Tribuch, Stewart Hoffer PLLC, Houston, TX, for Plaintiffs.

Barbara Ann Callistien, Harris Cty Atty's Off., Lina Peng Garcia, Houston, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

GRAY H. MILLER, District Judge.

Pending before the court are defendants' motions for summary judgment and separate trials or severance. Dkts. 54, 59. Upon considering the parties' arguments, the valid summary judgment evidence, and the applicable law, the court is of the opinion that the defendants' motion for summary judgment be GRANTED IN PART and DENIED IN PART. Furthermore, based on the court's decision regarding defendants' motion for summary judgment, the court finds that the motion for separate trials or for severance should be DENIED.

### BACKGROUND

In August of 2002, Perry Wooten stepped down from his post as Constable for Harris County Precinct 7 to face criminal charges. Michael Charles Butler was appointed in August of 2002 to complete Wooten's term ending December 2004. Butler ran for re-election in a hotly contested Democratic primary, but lost in a run-off election. The plaintiffs were all employees of Precinct 7 during Butler's term. Between the time of the run-off election and the end of Butler's appointed term, Butler terminated the employment of all seven employees at different times and for different given reasons. The plaintiffs allege that they were fired because they supported candidates other than Butler in the primary elections. They claim that Butler retaliated against them for exercising their First Amendment rights to free speech and free associ-

ation. They bring suit against Butler in his individual capacity and against Harris County under 42 § 1983 for *inter alia* losses of past and future wages, and lost fringe benefits. Additionally, the plaintiffs seek punitive damages from Butler in his individual capacity. Two of the plaintiffs, James Senegal and David Joubert, also bring defamation charges against Butler because he reported to the Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE") that those plaintiffs were terminated for "official misconduct." They seek actual, consequential, special, and punitive damages.

### ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Christopher Village, L.P. v. Retsinas,* 190 F.3d 310, 314 (5th Cir. 1999). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Daniels v. City of Arlington, Tex.,* 246 F.3d 500, 502 (5th Cir.2001), *cert. denied,* 534 U.S. 951, 122 S.Ct. 347, 151 L.Ed.2d 262 (2001). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.,* 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322, 106 S.Ct. 2548. If the moving party fails to meet this burden, then they are not entitled to a summary judgment and no defense to the motion is required. *Id.*

"For any matter on which the non-movant would bear the burden of proof at trial ..., the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell,* 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting FED. R. CIV. P. 56(e)).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *Adams v. Travelers Indem. Co. of Conn.,* 465 F.3d 156, 163–64 (5th Cir.2006). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence, disregard all evidence favorable to the moving party that the jury is not required to believe, and give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Jones v. Robinson Property Group, L.P.,*

427 F.3d 987, 993 (5th Cir.2005). However, the nonmovant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of Wash.,* 276 F.3d 754, 759 (5th Cir.2002); *see also Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du–Ra–Kel Corp.,* 569 F.2d 869, 872 (5th Cir.1978); *see also Galindo v. Precision Amer. Corp.,* 754 F.2d 1212, 1221 (5th Cir.1985).

## 1. First Amendment Retaliation

 The government may not force its employees to relinquish their First Amendment rights to free speech and free association. *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Beattie v. Madison County Sch. Dist.,* 254 F.3d 595, 600–01 (5th Cir.2001). However, in the interest of an efficient workplace, the government may limit free speech within certain guidelines. *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. There are four requirements for plaintiffs to prove a First Amendment retaliation claim. *Beattie,* 254 F.3d at 601 (citing *Harris v. Victoria Indep. Sch. Dist.,* 168 F.3d 216, 220 (5th Cir.1999)). First, they must demonstrate that they suffered an adverse employment action. *Id.* Second, they need to show that their speech was about a matter of public concern. *Id.* Third, the interest of the plaintiffs in speaking must outweigh the county's interest in an efficient workplace. *Id.* And fourth, the speech must have motivated the adverse employment decision. *Id.* If the plaintiffs carry their burden to prove all four of these prongs, a public employer can still escape liability if it can show "that it would have taken the same action 'even in the absence of the

protected conduct.'" *Hitt v. Connell,* 301 F.3d 240, 249 (5th Cir.2002) citing *Gerhart v. Hayes,* 217 F.3d 320, 321 (5th Cir.2000) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

## A. The Plaintiffs Who Fail *Mt. Healthy*

In the case of five out of the seven plaintiffs, the *Mt. Healthy* inquiry is dispositive. Therefore, even though theoretically *Mt. Healthy* only swings into play once the plaintiffs have proved the four prongs of their First Amendment retaliation claims, the court will address it first.

### i. James Senegal

 Senegal was promoted from reserve to fulltime deputy in June of 2004 several months after the unsuccessful runoff election. Dkt. 64, Ex. K. Therefore the protected speech, if there were any, would have occurred before he was hired. He was only employed full-time for approximately six weeks. *Id.* During that time, Butler received several complaints from tow truck drivers to the effect that Senegal was favoring one tow truck driver over the rest. Dkt. 64, Ex. B at 244–47. Additionally, there is evidence that the favored tow truck driver was not even licensed to pick up cars from that section of the toll road. Dkt. 59, Ex. 8. Butler also received a written complaint from a citizen, Tate Powers. Dkt. 59, Ex. 9. Senegal pulled Powers over for driving under the influence. Powers asked Senegal if there was any way he could get out of the ticket. Senegal told him that if he could negotiate a price with the tow truck driver to drive him home, then Senegal would not issue the citation. Powers did not have enough money with him to pay, but called friends and family for a loan. Butler had Lt. Jerry Lawrence investigate the claims. Dkt. 59, Ex. 9. Lawrence spoke with Pow-

ers's friends, checked Powers's cell phone records, and determined that the complaint against Senegal was valid. *Id.* Senegal admits to the exchange but claims that it was not against policy. Based on the written complaints of the tow truck drivers, Powers's written complaint, Powers's phone records, and the testimony of Powers's friends, the court finds that Butler had sufficient independent reasons to terminate Senegal's employment. Additionally, since Butler actually hired Senegal after the run off election, the expression played no role in Butler's decisions to hire and later fire Senegal. Therefore, under *Mt. Healthy,* Senegal's First Amendment retaliation claim must fail because Butler would have terminated Senegal's employment absent the alleged expression.

#### ii. David Joubert

■ Joubert's position as a deputy was terminated on October 29, 2003. Butler offers two reasons for the termination. First, Joubert arrested Pennelopia Cooper for an outstanding warrant without checking to see if the warrant was valid. Dkt. 59, Exs. 12 & 13. Had he done so, he would have discovered that the warrant had been paid in full just two days before. Cooper filed a complaint against Joubert. *Id.* Butler cautioned Joubert about not following proper procedures and stressed that Joubert's actions had exposed the county to liability. In spite of this warning, Joubert later improperly executed a warrant on Rueben Reed. Dkt. 59, Ex. 14. Mr. Reed asked to be allowed to go to his house in order to get the money to pay the fine. *Id.* Joubert agreed, handcuffed Reed with Reed's hands in front of his body, against county policy, and took Reed to Reed's home to get money, also against

county policy. *Id.* Joubert then took possession of the money and Reed's other personal belongings including his watch and took Reed to jail. *Id.* Joubert never inventoried the money when he took possession of it. *Id.* Furthermore, the next day Reed came back to the station complaining that his watch had not been returned to him. *Id.* When Captain Scott asked Joubert, Joubert claimed that he had the watch on the seat of his car. Dkt. 59, Ex. 11 at 68–72; Ex. 14 He explained that it must have come out of the property bag and gotten lost under paperwork on the seat. *Id.* Although Joubert claims that he intended to turn the watch in to Butler, he did not do so until asked about it. Dkt. 59, Ex. 14. Butler then fired Joubert because he had broken numerous county policies designed for the safety of the arrestees and the deputies, and had yet again exposed the county to liability. Although Joubert claims that he did not support Butler's campaign, there is scant support in the record for this contention. Moreover, there is some evidence that Joubert made statements to Butler indicating that he supported Butler and attended a Butler fundraiser. Dkt. 59, Ex. 22 at 35–36. If Butler even knew about Joubert's political leanings—which is not at all clear—it played no role in Butler's decision to fire him. Accordingly, based on the written complaints of Cooper and Reed, two neutral third parties, detailing numerous violations of county policy, the court finds that Butler would have fired Joubert regardless of any alleged improper motive.

#### iii. Kendria Newsome

■ Newsome worked as a deputy from March 2001 until June 2004 when she was fired. During her tenure she was assigned first to the ASAP[1] program, then to the

---

1. ASAP stands for Absent Student Assistance Program. It is an HISD program aimed at reducing absenteeism.

Harris County Toll Road, and then back to ASAP. She was first transferred away from ASAP because she was unable to work productively with her supervisor, Kenneth Smith. Dkt. 64, Ex. M at 21–22. However, while Newsome was working at the toll road, Butler received complaints that she was uncooperative and unavailable for necessary duties like escorting the vans transporting money from the toll booths to the office. Dkt. 64, Exs. B at 281–82 & O; Dkt. 59, Ex. 17. Additionally, she got into a disagreement with a toll road employee resulting in a physical assault on the employee. *Id.* Although the scuffle was eventually considered to be an accident, the toll road authority requested that Butler transfer Newsome elsewhere. Dkt. 59, Exs. 16 & 18. Butler did transfer her back to the ASAP program. Dkt. 59, Ex. 19. Butler began receiving complaints about Newsome's lack of cooperation and professionalism soon thereafter. Dkt. 59, Exs. 20 & 21. Two different principals wrote letters to Butler saying that if Newsome was going to continue in the ASAP programs, then the principals would rethink whether they wished to use the ASAP program at all.[2] *Id.* Butler terminated Newsome's employment.

Newsome argues that the real reasons that she was fired were another candidate's campaign sign that was spotted in her garage, and a party she held to which her co-workers were not invited, but another candidate was. Dkt. 59, Ex. 15 at 63. *But see* Dkt. 59, Ex. 40. Even assuming that these allegations are true—which the record does not support—Butler clearly had sufficient reason to fire her. And, in light of the letters from the principals and the toll road authority, it is likely that Butler would have fired her whether her allegations were true or not. Therefore,

the court finds that under the *Mt. Healthy* test, Butler may not be held liable for any improper motive, if there was one.

*iv. John Murphy*

■ Murphy worked as a deputy for the period from January 2001 to April 2004. During that time, he was the subject of a remarkable number of citizen complaints. Dkt. 64, Ex. L at ex. 21. Michael Scott testified that no other deputy had received nearly that many. Dkt. 64, Ex. L at 194–95. Although a majority of the complaints were unable to be sustained upon investigation, they did evince a theme of rude behavior, threats of jail, and a lack of professionalism. *Id.* The last two complaints were sustained, however. Dkt. 59, Ex. 25. In March of 2004, Murphy stopped Trina Culpepper for speeding. *See* Dkt. 59, Ex. 28. He threatened her with jail and called her supervisors at work to tell them that Culpepper was being a problem. *Id.* Culpepper filed a complaint. *Id.* Culpepper's supervisors also filed written statements that Murphy had called them. *Id.* The incident was not recorded on Murphy's patrol car camera, because, in violation of county policy, Murphy did not turn on his camera. Dkt. 59, Ex. 28. Murphy was aware of the policy; he had signed a copy of it the previous year. *Id.* The second complaint was from Dale Booth. Dkt. 59, Ex. 30. Murphy stopped him for speeding. *Id.* Again Murphy was rude to a citizen, threatening Booth with jail. *Id.* Again none of the incident was caught on tape, because Murphy failed to activate his camera. *Id.* Sgt. Michael Hartley investigated and sustained the complaint. *Id.* Butler subsequently terminated Murphy's employment as a deputy.

---

**2.** Programs like ASAP and toll road duty are funded by the entities receiving the service. If the schools discontinued the ASAP program, funding for an ASAP deputy would disappear. Dkt. 64, Ex. B at 256–57.

There is no evidence in the record to suggest that Murphy expressed his political leanings in any outward manner, or that Butler had any concept of Murphy's political affiliations. And, even if Butler had reason to know that Murphy did not support him, Butler has shown that he would have fired Murphy notwithstanding any exercise of free speech rights. Accordingly, Murphy's retaliation claim fails.

### v. Leon Hubbard

■ Hubbard worked as a deputy for Precinct 7 from approximately 1996 to November 2004. When Hartley, Hubbard's supervisor, informed Hubbard of the decision to transfer him, Hubbard became enraged and profane. Dkt. 59, Ex. 32. Although Hubbard could not recall exactly what he said, he is reported as saying "I ain't going and they can't make me ... This is bullshit and you can tell them that I said it is bullshit ... I'm not going ... I'm leaving." *Id.* The substance of the conversation was relayed to Butler. *Id.* Hartley later called Hubbard to ask if Hubbard still refused the transfer. Hubbard reportedly said yes. *Id.* While there is some question as to whether Hubbard's statements constituted a resignation, Butler did send two deputies to Hubbard's house with a termination letter. *Id.* When the two deputies delivered the letter to Hubbard at home, he again became enraged and profane. *Id.* He is reported as throwing his badge, identification, and equipment key into the front yard and saying "Take the shit and get the___ off my property, right now!" *Id.*

■ The *Mt. Healthy* analysis of Hubbard's case is somewhat problematic. If the adverse action was the termination itself, then the insubordination would clearly be a viable cause for termination. Even though Hubbard claims he was not actually refusing to take the evening shift, he does admit that his language was inappropriate. Dkt. 59, Ex. 31 at 57–58. In that case, Hubbard's claim fails under *Mt. Healthy*. If, however, the adverse employment action of which Hubbard complains was the transfer to the less favored night shift, then the insubordination cannot be the reason for the transfer. Rather, it was a result of the transfer. However, Hubbard's supervisor, Hartley provides a legitimate reason that Hubbard would have been transferred even if he had supported Butler's campaign. In Hartley's affidavit, he claims that Hubbard was transferred to the night shift so Hartley could supervise him in person. Dkt. 59, Ex. 32. Hartley states that Hubbard's productivity on the day shift had been low, so Hartley had suggested that Hubbard be transferred to Hartley's shift—night shift.[3] *Id.* Hubbard claims that Butler knew Hubbard did not support him for Constable and therefore fired him solely upon an alleged pattern of activity to be supplied by the other plaintiffs. Dkt. 59, Ex. 45. Essentially, he has no facts of his own regarding Butler's alleged knowledge of Hubbard's political leanings. *Id.* Accord-

---

**3.** Even if the court found that Hartley's testimony was insufficient under *Mt. Healthy*, Hubbard has failed to meet his burden to prove that the transfer was an adverse employment decision. Although a transfer can be considered an adverse employment action, there must be some evidence in the record that the transfer was to a position less desirable than the plaintiff's former position. *See Breaux v. City of Garland*, 205 F.3d 150, 160 (5th Cir.2000) (citing testimony that the position to which plaintiff was transferred was not viewed as punitive to support the conclusion that the plaintiff's transfer was not an adverse employment action). Nothing in the record, except Hubbard's own testimony suggests that the transfer was to a less desirable position. And, his subjective dislike of the position is not sufficient to characterize the transfer as adverse. *Id.*

ingly, Hubbard's retaliation claim fails both because he has not carried his burden to show an adverse employment action, and because the county has shown that Butler would have transferred Hubbard to the night shift and later fired Hubbard notwithstanding his failure to support Butler's campaign.

### B. The Plaintiffs who survive *Mt. Healthy.*

The *Mt. Healthy* test does not readily dispense with the claims of the remaining two plaintiffs. Their cases call for the entire First Amendment inquiry.

#### i. *Catherine Hayes*

Catherine Hayes[4] was a deputy for Precinct 7 from February 2001 to October 2004. She did not support Butler in his re-election bid. Instead she supported May Walker. While she did not proclaim her allegiance for all of her co-workers to hear, she did not hide the fact that she supported Walker. *See* Dkt. 64, Ex. B at 104. In October 2004, fully six months after Butler lost the primary run-off and just before the general election, an anonymous caller reported that Hayes had a May Walker campaign sign in the trunk of her patrol car. Dkt. 64, Ex. B at 233. She had, in fact, picked up two signs the evening before with the intention of placing one in her yard and one in her fiancé's yard. Dkt. 59, Ex. 33 at 76–79. Although she placed the one in her own yard, the one for her fiancé was still in the back of her patrol car when she went to work the next day. *Id.* Butler had Hayes's patrol car inspected while Hayes was in the office that day. *See* Dkt. 59, Ex. 34. Upon finding the May Walker campaign sign in Hayes's trunk, Butler fired her. Dkt. 64, Ex. E at 80. The reason given was that she was engaging in political activity on county time, while in her deputy uniform, using her county patrol car in contravention of county policy.

 In order to meet her burden and survive summary judgment on her First Amendment retaliation claim, Moore must first show that she suffered an adverse employment action. Since her employment was terminated, she easily meets the first prong. *See Martinez v. Tex. Dept. of Criminal Justice*, 300 F.3d 567, 576 (5th Cir.2002). Second she must demonstrate that her speech involved a matter of public concern. Political speech is the very epitome of speech regarding a public concern. *Brady v. Fort Bend County*, 145 F.3d 691, 707 (5th Cir.1998). Third, her interest in speaking must outweigh the county's interest in an efficient workplace. In analyzing this third prong, the court must engage in the *McBee–Pickering–Connick* balancing test. *Click v. Copeland*, 970 F.2d 106, 112 (5th Cir.1992). The Fifth Circuit described the inquiry as placing the facts of each case on a continuum. *Id.*

At one end of the spectrum were *Elrod [v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ] and *Branti, [v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) ] where little weighing was necessary because "no countervailing considerations" appeared against the employees' right to believe as they chose. At the other end lay *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir.1970), and *Duke v. North Texas State Univ.*, 469 F.2d 829 (5th Cir.1972), "where instructors had incited student disturbances that were sufficiently serious to call in question the ability of academic

---

**4.** Catherine Hayes was also known as Catherine Moore and Catherine Norfleet during the time she worked for Precinct 7. To avoid confusion, the court will identify her as Catherine Hayes—the name under which she filed her claim.

authorities to maintain order on campus."

*Id.* (quoting *McBee v. Jim Hogg County,* 730 F.2d 1009 (5th Cir.1984)). This case, like many, falls somewhere in the middle. *McBee* requires the court "to balance the First Amendment values implicated by those activities against the possible disruptive effect on governmental provision of services within the specific context of each case." *McBee,* 730 F.2d at 1016–17. The *Click* court listed factors—no single one of which is dispositive—to aid in the balancing.

(1) whether the employee's actions involve public concerns;

(2) whether close working relationships are essential to fulfilling the employee's public responsibilities;

(3) the time, place, and manner of the employee's activity;

(4) whether the activity can be considered hostile, abuse, or insubordinate; and

(5) whether the activity impairs discipline by superiors or harmony among coworkers.

*Click,* 970 F.2d at 112. As mentioned in the previous prong, political speech is a matter of public concern, so that factor weighs in favor of Hayes. Close working relationships are not a function of office size or the number of personnel. *McBee,* 730 F.2d at 1016–17. Rather, the inquiry focuses on whether the speech "affected working relationships necessary to the department's proper functioning." *Harris,* 168 F.3d at 223. The "speech" in question involved Hayes, (1) being handed two May Walker yard signs while Hayes was in uniform and in her patrol car, (2) placing one yard sign in the front yard of her house, and (3) placing the other yard sign in the trunk of her patrol car. It is difficult to see how this expressive activity could impair the functioning of the department. Had she put a sign on the outside

of the patrol car, walked up and down a busy street with a sign while in uniform, or even worn a May Walker campaign button on her uniform, then her activity might be disruptive in that it would reflect badly on the appearance of neutrality of the constable's office. However, the ability of a yard sign inside the closed trunk of a car to reflect badly upon the constable's office is minimal at best. Even the transfer of the sign from the campaign worker to Hayes while she was in uniform would not have had much impact because of the short duration of exposure of the sign to the public—if there was, in fact, any public to witness the transfer. And, regardless of whether she wore her uniform when she placed the yard sign in the front yard of her personal residence, that is a reflection of her own personal beliefs rather than the constable's. In *Brady v. Fort Bend County,* the Fifth Circuit found that employees who had participated in fund raisers, worn their candidates paraphernalia, gone door to door canvassing, put yard signs in their yards and bumper stickers on their personal vehicles had a minimal impact on the efficiency of the sheriff's department, if any. *Brady,* 145 F.3d at 707–08. Unlike the plaintiffs in *Brady,* Hayes was in uniform during her "expression." However, Hayes's activities took place within a 24 hour period and was almost entirely passive. In *Brady,* the plaintiffs' activities were prolonged, obvious, and active. *Id.* Here, where Hayes campaigned for a short duration and with greater restraint, the disruption to the workplace was less than that in *Brady*—minimal, if at all. The same holds true for the question of the time, place, and manner of the expression. Hayes's conduct was not hostile or insubordinate. And, the act of putting a campaign sign in the trunk of the patrol car certainly did not impair discipline or disrupt harmony. In sum, the *Pickering* balancing weighs in favor of Hayes and she

has carried her burden to show the third prong of the test.

▉ Finally, Hayes must show that the speech motivated the adverse employment decision. In Butler's deposition he was asked why he fired Hayes. He responded "[s]he was fired for having campaign material in her patrol car" and no other reason. Dkt. 64, Ex. B at 228. Since the campaign material, or the possession of the campaign material is the speech in question, it is uncontested that it caused the decision to terminate her employment. Admittedly, there is law to support the concept that a "non-partisan good government edict designed to divorce law enforcement from politics" can be constitutional. *Matherne v. Wilson*, 851 F.2d 752, 760 n. 44 (5th Cir.1988) (distinguishing the unconstitutional policy allowing campaigning only for the incumbent sheriff from a general prohibition on campaigning). However, "even a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir.2001) (citing *Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). And, there is conflicting evidence in the record regarding whether this policy was applied uniformly under Butler. However, at the very least, it is uncontested that the "if you want to support a candidate, you do it on your own time" rule was only instituted after Butler lost in the primary runoff election. Dkt. 64, Ex. B at 124–25. While Butler was campaigning, the rule seems to have been best honored in the breaking. When Butler decided to run for office, he held a meeting in Judge Green's office to announce his candidacy.[5] Dkt. 64, Ex. G at 35–36. Also, there is conflicting evidence as to whether other uniformed deputies had Butler campaign materials in their patrol car. Dkt. 59, Ex. 33 at 63. Moreover, the record suggests that uniformed deputies placed Butler yard signs while on duty. *Id.;* Dkt. 64, Ex. F at 61–65. And furthermore, Butler allegedly moved deputies' patrol areas right before the campaign so that they would be more visible to the voting public. Dkt. 64, Ex. K. Additionally, there is disputed testimony in the record to the effect that Butler held a meeting after the runoff election in which he thanked, by name, those employees who had supported him and warned those who did not support him that he knew who they were. Dkt. 64, Ex. B at 125, Ex. F at 92–94; Dkt. 59, Ex. 31 at 41. Butler denies having made the statement, while all of the plaintiffs claim he did make it. *Id. See also* Dkt. 64, Ex. G at 35. The court does not weigh the credibility of the evidence in a summary judgment motion, and therefore regards the statement as both material and in dispute. The burden now shifts to Butler to demonstrate that absent the protected activity he would have fired Hayes anyway. However, his deposition statement that the sole cause of the termination was the presence of campaign materials in her patrol car undermines any argument he might make under *Mt. Healthy.* Therefore, viewing the evidence in the light most favorable to Hayes, the court finds that Hayes has presented a genuine issue of material fact regarding Butler's reasons for firing her.

### ii. *Wilda Johnson*

Wilda Johnson was a secretary for the GREAT[6] program at Precinct 7 from July

---

5. Some evidence suggests that it was the conference room at Precinct 7 rather than Judge Green's office. Either place is county property. Dkt. 59, Ex. 11 at 53.

6. GREAT stands for Gang Resistance Education and Training. Dkt. 64, Ex. C at 17.

2000 to May 2004. Dkt. 64, Ex. C at 16. In January 2004, she and two other GREAT employees had significant failures of their county-issued laptops. Dkt. 64, Ex. C at 42. The laptops were not taken to the county technology group. Instead they were given to a Precinct 7 deputy, Scott Holland, to repair. *Id.* While repairing Johnson's laptop, Holland discovered a power point presentation in support of a different candidate for constable. Dkt. 64, Ex. D at 60. He powered down the computer and reported to Butler. Dkt. 64, Ex. B at 200–01. Butler told Holland to search the computer for other violations of county policy. *Id.* During the search, Holland found a pornographic picture and inappropriate chat room conversation seemingly between a 19 year old boy named Kevin and underage girls. Holland wrote a report for Butler detailing the campaign materials, pornography, and chat room activity. Dkt. 64, Ex. D at exs. 4 & 5. He concluded that because of the way the Microsoft profiles were configured on Johnson's computer, she may not have been the person engaging in the chat room talk. *Id.* Butler, fearing that the mention of the campaign material would cloud the issue, caused Holland to rewrite the memo omitting the section regarding the campaign power point presentation. Dkt. 64, Ex. B at 218–21. Then, he called Johnson into his office to ask her about the chat room talk. When she would not or could not tell him who Kevin was, he fired her. *Id.*

■ The analysis of Johnson's retaliation claim parallels Hayes's claim in many respects. First, as in Hayes's case, Johnson's employment was terminated, so she easily meets the first prong. Second, her speech involved at least one matter of public concern—politics. Third, her

*McBee–Pickering–Connick* balancing test places her in the center of the continuum. As with Hayes, the issue becomes using county property to facilitate political speech. The county does have a policy that county computers are not for personal use.[7] Dkt. 64, Ex. B at 184, ex. 22. This policy is neutral and facially innocuous. But, as discussed below, the policy may have been used in an unconstitutional manner like in Hayes's case. However, unlike Hayes, there is no indication in the record that Johnson was in uniform or on duty when the power point was made or presented—even if it ever was. Furthermore, it is unclear whether the computer was labeled in any way that would cause a third party to attribute the power point presentation to the county. Certainly the expression did not cause disharmony in the workplace. In fact, the power point would never have been discovered had Holland not taken it upon himself to open files on the computer. Viewing the circumstances as a whole, the *Pickering* balancing weighs in favor of Johnson.

■ The fourth prong requires Johnson to demonstrate that her protected expression caused the adverse employment action. The defendants argue that they terminated Johnson's employment because of the pornographic picture and the chat on Johnson's laptop. Butler claims that it was his belief that the laptop, when issued to Johnson, was brand new. Dkt. 64, Ex. B at 187–88. Therefore, he reasoned that Johnson was responsible for anything on the laptop. However, several points bring his stated reasons for Johnson's firing into question. First, another deputy, Waynepaul Shambo, was also found to have a pornographic picture on his laptop. Dkt. 64, Ex. C at 137–40. However, he was not

7. The policy does, however, allow incidental or de minimus personal use. Dkt. 64, Ex. B at 104, ex. 22.

even reprimanded. *Id.* Second, Catherine Hayes's laptop computer evidenced a great deal of chat room activity, but she was never disciplined. Dkt. 64, Ex. B at 226–27. Third, Holland's report clearly stated that Johnson may not have been the person engaged in the chat. Dkt. 64, Ex. B at 203–04. Fourth, Butler's removal of the campaign materials from Holland's report so it would not cloud the issue has created rather the opposite impression. *See* Dkt. 64, Ex. B at 218–21. Instead of convincing the court that Butler did not take the campaign material into account in his firing decision, the omission draws the court's attention to the possible importance of the campaign material. Once Butler was informed of the campaign material, he sent Holland back to dig deeper into Johnson's laptop. Dkt. 64, Ex. B at 200–01. The search terms included the names of other candidates in addition to some standard search terms. Dkt. 64, Ex. C at 69. Finally, Butler admits that·he did not believe that Johnson had actually authored the chat. Dkt. 64, Ex. B at 205. Even if Butler argues that he fired Johnson for allowing someone else to author the chat on the county laptop, the record suggests, as stated above, that the policy that county laptops could only be used by county personnel for county purposes was inconsistently applied. "Whether an employee's protected conduct was a substantial or motivating factor in an employer's decision to take action against the employee is a question of fact, ordinarily rendering summary disposition inappropriate." *Click,* 970 ,F.2d at 113 (citing *Brawner v. City of Richardson, Tex.,* 855 F.2d 187, 193 (5th Cir.1988)). The court makes no finding as to whether Butler's motivation was improper. But, the court does find that based on the facts in the summary judgment record, a reasonable trier of fact could give credence to either party's argument.

Next, the court must look at Butler's actions through the lens of *Mt. Healthy.* The actual statement in *Mt. Healthy* exhorts courts to evaluate whether the defendant has "shown by a preponderance of the evidence that it would have reached the same decision as to [its adverse employment decision against plaintiff] even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Fifth Circuit case law reveals two competing ways to approach this inquiry. Some case law would suggest that once the defendant shows that it could have reached the same decision, the burden shifts back to the "employee [to] refute this assertion by showing that the employer's proffered explanation is merely pretextual." *Click,* 970 F.2d at 113; *see also Professional Ass'n of College Educators, TSTA/NEA v. El Paso County Community College Dist.,* 730 F.2d 258, 267 (5th Cir.1984) ("The evidence was sufficient to support the conclusion that all four of the charges [employer] lodged against [employee] were pretexts to conceal his improper motive."). *Accord McBee,* 703 F.2d at 844 (examining whether the new Sheriff's given reasons that he did not rehire the plaintiffs were merely a pretext); *Allaire v. Rogers,* 658 F.2d 1055, 1062 (5th Cir.1981) (identifying the only substantial question in the case as whether the supervisor's given reasons for termination were a pretext to cover for actual First Amendment retaliation). Other case law eschews the shifting of the burden back to the plaintiff to prove pretext and conflates the inquiry by asking not *could* the employer have taken the same action, but *would* the employer have taken the same action. *See, e.g., Gonzales v. Dallas County, Tex.,* 249 F.3d 406, 412 n. 6 (5th Cir.2001) (citing *Brady v. Fort Bend County,* 145 F.3d 691, 711–12 (5th Cir. 1998); *Mooney v. Aramco Serv. Co.,* 54

F.3d 1207, 1216 (5th Cir.1995)) ("As this court has made clear, First Amendment retaliation claims are governed by the *Mt. Healthy* 'mixed-motives' framework, not by the *McDonnell Douglas* pretext analysis."). Under either analysis, the answer is the same. Based on the inconsistent application of the county policy and Butler's testimony that he did not believe Johnson authored the chat, she has sufficiently created a fact issue as to whether Butler *would* have fired her absent the campaign materials on her computer. Accordingly, defendants' motion for summary judgment fails against Johnson.

### C. Butler, Harris County, and the Official Policymaker

Because the court finds that Hayes and Johnson survive defendants' motion for summary judgment, it must now address the question of which parties remain as defendants.

#### i. *Michael Butler*

 Plaintiffs have sued Butler in his individual capacity. Butler replies that his actions are protected by qualified immunity. One Fifth Circuit case suggests that the qualified immunity test for First Amendment retaliation cases is coterminous with the *Mt. Healthy* inquiry. *Hitt v. Connell*, 301 F.3d 240, 249 (5th Cir.2002). And, there is a certain symmetry to the two inquiries. However, many other Fifth Circuit cases perform the inquiries separately, therefore, the court will do so also. "Qualified immunity shields certain public officials performing discretionary functions from civil damage liability." *Harris*, 168 F.3d at 223. The inquiry consist of two questions. The first asks whether the plaintiff(s) has alleged the violation of a constitutional right. *Vojvodich v. Lopez*, 48 F.3d 879, 886 (5th Cir.1995). Both Hayes and Johnson have demonstrated a question of fact as to whether their choice to support a candidate for constable and their

exercise of First Amendment right was the motivating factor for the termination of their employment. The second question informs the answer to the first. It asks whether "measured by an objective standard, a reasonable officer would have known that his action was illegal." *Matherne*, 851 F.2d at 756. Put another way, was it "clearly established" in 2004—when Butler fired Hayes and Johnson—that it was unconstitutional for a constable to terminate the employment of an employee in retaliation for that employee's support of a different candidate for constable. *Click*, 970 F.2d at 109. Because of the presence of the political patronage system in Texas for the elections and staffing of county constables, the question of First Amendment retaliation for political speech is not a new one. *See Matherne*, 851 F.2d at 759–60; *McBee*, 730 F.2d at 1011–16. Even if the court could possibly find that a reasonable constable would not know he could not fire employees for political speech unless the speech itself was disruptive, the record shows that Butler certainly did know. Why else would he have felt that Holland's report on Johnson's computer should be purged of all references to the campaign power point lest it "cloud the issue"? Accordingly, Butler is not entitled to qualified immunity against the claims of Hayes and Johnson because a reasonable constable would have known that, based on the circumstances, firing them would violate their First Amendment rights to political speech. Butler also claims qualified immunity with regard to the defamation claims of Senegal and Joubert. However, as will be discussed below, the qualified immunity issue for those claims is moot.

#### ii. *Harris County*

 A municipality may not be held liable under § 1983 based on a *respondeat superior* theory. *Piotrowski*, 237 F.3d at 578. Instead, the plaintiffs must show that

**990**

the injury resulted from "the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy." *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Harris County argues that it cannot be held liable for Butler's actions because he is not an official policy maker. They cite the Fifth Circuit's opinion in *Rhode v. Denson,* 776 F.2d 107 (5th Cir.1985). *Rhode* involved a § 1983 suit brought by a citizen for constitutional torts arising from his apprehension and arrest by a constable. The court held that the constable was not a policy maker. While the *Rhode* opinion is fairly terse, the court seemed most persuaded by the fact that, in its view, the constable was unable to exercise discretion except within the limited duties of making arrests, serving warrants, and serving process. *Id.* at 109. Harris County argues that *Rhode* stands for the proposition that a Texas constable can never, in any circumstances, be a policy maker. The plaintiffs argue that *Rhode* does not apply, because the Fifth Circuit has recognized that in an employment situation the inquiry changes. Moreover, they argue that even if *Rhode* did apply to Texas constables in general, Harris County would still be liable because it falls under the "rubber stamp" exception. The court agrees that the plaintiffs have carried their summary judgment burden to show that Harris County rubber stamped Butler's hiring decisions.

The rubber stamp exception, stated simply, imputes the tainted motivations of the subordinate to the titular policymaker, if that policymaker essentially accepted the subordinate's recommendations without evaluation of any kind. *Johnson v. Louisiana,* 369 F.3d 826, 832 (5th Cir. 2004); *Beattie v. Madison County Sch. Dist.,* 254 F.3d 595, 604 n. 14 (5th Cir. 2001); *Rios v. Rossotti,* 252 F.3d 375, 382 (5th Cir.2001); *Russell v. McKinney Hos-*

*pital Venture,* 235 F.3d 219, 227 (5th Cir. 2000). Many circuits have adopted the concept of the rubber stamp exception, some calling it by Judge Posner's appellation—the cat's paw. *See Russell,* 235 F.3d at 227 (citing cases from the 1st, 6th, 8th, 10th, 11th and D.C. Circuits). If "we adhered to a rigid formalistic application, employers could easily insulate themselves from liability by ensuring that the one who performed the employment action was isolated from the employees, thus eviscerating the spirit of the 'actual decisionmaker' guideline." *Id.* at 227 n. 13.

The burden to show the rubber stamp exception lies with the plaintiff. *See Beattie,* 254 F.3d at 604 n. 14. The plaintiffs have adduced enough summary judgment evidence to meet this burden. The determination of the titular policy maker is a matter of state law. *Brady v. Fort Bend County,* 145 F.3d 691, 698–99 (5th Cir.1998). According to Texas law, the Harris County commissioners' court has the power to hire and fire deputies. TEX. LOCAL GOV.CODE ANN. § 86. Therefore, in order for the plaintiffs to show that the commissioners' court was Butler's "cats paw," they must demonstrate that Butler's hiring and firing decisions were accepted without question. In his deposition, Butler states unequivocally that the county commissioners' vote to add or delete deputy constables was "just a formality." Dkt. 64, Ex. B at 248. Butler never had to go in front of the commissioners and explain any hiring decision he made. *Id.* at 249. By Butler's own admission, the commissioners rubber stamped his decision to fire employees, including Hayes and Johnson. Accordingly, Butler's actions may be imputed to Harris County. Therefore, Harris County will not be dismissed as a party.

## 2. Defamation

■ Plaintiffs Senegal and Joubert also bring claims of defamation against Butler for reporting to TCLEOSE that they were fired for official misconduct. Official misconduct is defined in the Texas Local Government Code as "intentional, unlawful behavior relating to official duties by an officer entrusted with the administration of justice or the execution of the law. The term includes an intentional or corrupt failure, refusal, or neglect of an officer to perform a duty imposed on the officer by law." TEX. LOC. GOV'T CODE § 87.011(3). The summary judgment evidence supports the fact that Butler believed that both Joubert and Senegal neglected to perform their duties or acted unlawfully and therefore fired them for official misconduct. Butler believed that Joubert made an illegal arrest and detainment when he arrested Pennelopia Cooper on a warrant that was no longer valid. Dkt. 59, Ex. 12. *See also* TEX. PENAL CODE § 20.02. And according to Butler's investigation, Senegal allegedly played "let's make a deal" when he allowed motorists to avoid arrest for drunk driving if they could pay a hand-picked tow truck driver to take them home. Dkt. 59, Ex. 51. It was his duty to arrest motorists he stopped for DWI, not undertake to enrich an unlicensed tow truck driver. Because both deputies were fired for official misconduct as defined by Texas statutes, they cannot sustain a defamation claim.

"To prove a cause of action for defamation, a plaintiff must prove that (1) the defendant published a statement of fact, (2) the statement was defamatory; (3) the statement was false, (4) the defendant acted negligently in publishing the false and defamatory statement; and (5) the plaintiff suffered damages as a result." *Brown v. Swett & Crawford of Texas, Inc.,* 178 S.W.3d 373, 382 (Tex.App.-Houston [1 Dist.] 2005, no pet.) (citing *WFAA–TV,*

*Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998)). "The sine qua non of recovery for defamation . . . is the existence of falsehood." *A.H. Belo Corp. v. Rayzor,* 644 S.W.2d 71, 79 (Tex.App.-Ft. Worth 1982, writ. ref'd n.r.e.) (quoting *Old Dominion Branch No. 496 Nat'l Assoc. of Letter Carriers v. Austin,* 418 U.S. 264, 283, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974)). Plaintiffs simply cannot prove that Butler negligently published a false statement. Butler believed that these two plaintiffs had committed official misconduct. He had the incidents investigated thoroughly and only upon a finding that the citizen complaints could be upheld did Butler terminate their employment. Therefore, the statements are not false. Or, at the very least, they were not made with negligence as to their truth. *Dolcefino v. Randolph,* 19 S.W.3d 906, 917 (Tex.App.-Houston [14th Dist.], 2000, no pet.). Accordingly, the plaintiffs' claim for defamation fails as a matter of law.

Additionally, defendants argue that Butler's action of reporting to TCLEOSE, if it were defamatory, would be protected by the doctrine of official immunity. Because the court finds that plaintiffs cannot prove the threshold element for defamation—the falsity of the statements—it need not wade into the murky depths of the qualified immunity inquiry.

## 3. Motion for Separate Trials

■ Lastly, pending before the court is defendants' motion for separate trials or severance. Dkt. 54. Defendants' main contention is the distinct nature of the seven plaintiffs' fact patterns from each other and the prejudice to the defendant caused by the sheer number of plaintiffs. Because by this order the number of plaintiffs has been reduced to two, the court finds that the defendants' "where there's smoke there's fire" argument loses a great

deal of force. Additionally, from an efficiency standpoint, the two plaintiffs' claims share several contested issues of fact and many of the same witnesses. Therefore, the court finds that the plaintiffs' interest in having the same jury decide common issues of fact outweighs any prejudice to the defendants from having two plaintiffs instead of one. *Castano v. Amer. Tobacco Co.,* 84 F.3d 734, 750 (5th Cir.1996). Accordingly, the defendants' motion for separate trials or severance is DENIED.

### CONCLUSION

For the foregoing reasons, the court finds that the defendants' motion for summary judgment should be GRANTED IN PART and DENIED IN PART. Defendants' motion is granted with respect to the retaliation claims of plaintiffs James Senegal, David Joubert, Leon Hubbard, Kendria Newsome, and John Murphy. Defendants' motion is also granted for the defamation claims of David Joubert and James Senegal. Defendants' motion is denied for the claims of plaintiffs Wilda Johnson and Catherine Hayes. Additionally, defendants' motion for separate trials or severance is DENIED.

It is so ORDERED.

Signed at Houston, Texas on March 20, 2007.